Francesco G. CAMPITI and Joseph
Pioggia, Plaintiffs,

v.

Michael A. WALONIS et al., Defendants.

Civ. A. No. 76–2968–C.

United States District Court,
D. Massachusetts.

June 30, 1978.

820

Max D. Stern, Burnham, Stern & Shapiro, Boston, Mass., for plaintiffs.

Lee Carl Bromberg, Sp. Asst. Atty. Gen., Dept. of Correction, Boston, Mass., for defendants.

## OPINION

CAFFREY, Chief Judge.

This is a civil action alleging violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C.A. §§ 2510–2520, brought pursuant to 42 U.S.C.A. § 1983. Jurisdiction is invoked under 28 U.S.C.A. §§ 1331 and 1343. Pendent jurisdiction is also alleged over a claim brought pursuant to Mass.Gen.Laws Ann. ch. 272, § 99(Q).

The plaintiffs in this action, Francesco Campiti and Joseph Pioggia, essentially complain about defendants' monitoring of a September 19, 1975 phone call. On that date, they were both inmates of the Massachusetts correctional system. They name as defendants Frank Hall, Massachusetts Commissioner of Corrections; Michael Walonis, an investigator for the Security Management Team (SMT) of the Department of Corrections; Frank Gunther, Superintendent of the Massachusetts Correctional Institution, Walpole (MCI Walpole); and Dennis Brown, Deputy Superintendent of MCI Walpole.

Plaintiffs' complaint, seeking both equitable and monetary relief, is in three counts. Count One charges interception of a wire communication without plaintiff's consent in violation of 18 U.S.C.A. § 2511(1)(a), which prohibits any person from "willfully intercept(ing), endeavor(ing) to intercept, or procur(ing) any other person to intercept or endeavor to intercept, any wire or oral communication"; Count Two alleges violation of plaintiffs' Fourth Amendment rights; and Count Three charges violation of the Massachusetts wiretap statute, *supra.* The Fourth Amendment claim which is the basis of Count Two was dropped prior to trial. Defendants have raised the affirmative defenses of (1) qualified immunity; and (2) certain federal and state statutory exemptions.

During the one-day non-jury trial held on March 7, 1978, the parties stipulated to the following relevant facts.

On September 13, 1975, plaintiffs were both inmates of the Franklin County House of Correction. Campiti was then serving a sentence to a state institution but had been transferred to the County House of Correction. On that date, the first of a series of articles appeared in the *Springfield Union* alleging that the plaintiffs had been receiving "improper" and "favored" treatment at the institution, which allegations resulted in the Department of Corrections conducting an investigation into those charges. A second investigation was conducted by the District Attorney of Franklin County. On February 6, 1976, both Campiti and Pioggia were indicted by a Franklin County Grand Jury for an offense allegedly committed during their incarceration in the Franklin County House of Correction. On November 16, 1976, Campiti was acquitted; thereafter the charge against Pioggia was dismissed.

It was further stipulated that there was no warrant or court order pursuant to which the September 19, 1975 telephone conversation at issue in this case was monitored. The disclosures made by defendant Walonis regarding that call were made pursuant to general authority granted to him by Hall to take discretionary action as an SMT investigator. While not all disclosures regarding the monitored call were specifically authorized by Hall, he did specifically authorize disclosure of Walonis' typewritten account of the conversation to the Assistant Attorney General of the Commonwealth and to the Franklin County District Attorney. Hall also authorized the oral disclosure made by defendant Walonis to the Franklin County District Attorney and to a state police officer named George Powers.

On the basis of the evidence adduced at trial, this Court finds the following additional facts:

Campiti had been convicted in 1974 of armed robbery and sentenced to a term of ten to fifteen years at MCI Walpole. He had been transferred from MCI Walpole to the Franklin County House of Correction.

Pioggia had been convicted of possession of an explosive device, received a state sentence of 12 months to the County House of Correction and a concurrent sentence of 18 months to the federal penitentiary.

The *Springfield Union* articles, referred to above, alleged in substance that Sheriff Martin conducted the administration of the Franklin County House of Correction in an improper manner, specifically that he showed favoritism to certain inmates, including Campiti, by affording them such privileges as work-release and furloughs. Because of these allegations, defendant Hall ordered Campiti transferred to MCI Walpole and also ordered an SMT investigation. After Campiti's transfer to MCI Walpole, he was placed in a maximum security unit. At some point thereafter, Campiti requested permission to call Sheriff Martin.

On September 19, 1975, Walonis travelled to MCI Walpole to conduct interviews in connection with another SMT investigation. After arriving at Walpole, he met with Gunther and Brown in Gunther's office. Since Gunther was aware of the ongoing SMT investigation into allegations concerning Campiti and Martin, he brought to Walonis' attention the fact that Campiti had requested permission to call Martin. Approval and monitoring of the call was discussed by the three defendants. I find that the three defendants present at that meeting agreed that permission for Campiti to make the call should be given and that Walonis should monitor it. Walonis then advised the correction officer who was to escort Campiti to the phone, Officer James Lambirth, that he would be monitoring the call at the switchboard. Walonis then went to a section of the prison known as the Outer Control Section where he monitored the call on a telephone wired directly into the main switchboard.

After Lambirth told Campiti his request to call Martin had been approved, Lambirth escorted Campiti to Deputy Superintendent Brown's office. Lambirth then placed the call through lines operated by the New England Telephone Company, a subsidiary of the Bell Telephone System and a com-

mon carrier engaged in providing and operating facilities for the transmission of interstate and foreign communications. All MCI Walpole internal telephone equipment, including the switchboard, was owned by the New England Telephone Company.

After Lambirth placed the call, he identified the receiving party as Martin, identified himself by name and as an MCI Walpole officer, and ascertained that Martin would accept a collect call from Campiti. Lambirth then relinquished the phone to Campiti and stepped to an outer office, where he could hear the sound of Campiti's voice but could not make out what he was saying. Although it was normal procedure for an escorting officer to remain within earshot during a call made by a maximum security inmate on institution equipment, Lambirth did not do so in this case because he knew that the call was being monitored by Walonis.

Walonis listened to the call while sitting next to the switchboard operator on a telephone wired directly into the switchboard. He made handwritten notes during the call, which all parties concede lasted approximately five minutes.

After Martin and Campiti spoke for one-and-a-half to two minutes, Campiti asked to speak to Pioggia. Martin handed the phone to Pioggia, who was standing next to him. Campiti then spoke to Pioggia for about a minute, which he was not authorized to do. Pioggia next returned the phone to Martin, who spoke to Campiti for another minute or so before hanging up.

I find that neither Campiti, Pioggia, or Martin consented to the monitoring nor was aware of it. No employee of the Department of Correction informed Campiti prior to the call that the telephone call would be monitored. The first time the plaintiffs learned of the monitoring of the call was during discovery proceedings in their Franklin County case. No institutional regulation then in effect at MCI Walpole informed inmates of the possibility of their phone calls being monitored. No evidence was adduced to support a finding that the monitoring was reasonably related to maintaining internal security at MCI Walpole, and I find it was not so related.

Shortly after the conclusion of the call, Martin telephoned defendant Hall with the intention of asking that Campiti be returned to Greenfield. Commissioner Hall had been advised by Walonis to expect the call. He did not take Martin's call that day.

During the time that Walonis had been a member of the Security Management Team, he had never previously monitored a telephone conversation. He had, however, monitored calls during earlier employment as a correction officer/switchboard operator at MCI Norfolk.

Subsequent to the monitoring, Walonis prepared a one-page report on the call, which was included as an exhibit in the final SMT report on the investigation. Walonis also telephoned Hall's office on the day of the call and described the substance of the monitored conversation either to Commissioner Hall or to Deputy Commissioner David Haley. On that same day Walonis orally informed Gunther, Brown and James Hoard, another SMT investigator, of the substance of the call. On or about September 22, 1975, Walonis described the substance of the monitored call to Robert Miranda, another SMT investigator working on the Franklin County investigation. On or about September 29, 1975, Walonis described the substance of the intercepted conversation to District Attorney John M. Callahan and State Police Lt. Detective George Powers.

I find that inmate phone calls made at MCI Walpole on institution phones going through the switchboard had been monitored prior to trial, but only in the sense that the correction officer escorting the inmate to the phone placed the call and remained nearby for its duration. Approximately two such calls per week were also monitored by means of an override system. The override system, which can cut into any call, serves several purposes. In an emergency, override lines provide instant contact with any part of the prison. Override lines are also used to monitor calls when suspicion exists of illegal inmate activity or to

ensure that inmates call persons they were approved to call. Additionally, override lines are used to monitor staff calls to ensure that staff are not using institution phones for personal use.

At the time Walonis monitored Campiti's call, he was aware of the federal wiretap statute, but he thought that a device extraneous to ordinary telephone equipment was necessary to violate the statute. Walonis testified that he was unaware of any Massachusetts statute prohibiting the monitoring of Campiti's call. Walonis further testified that on September 19, 1975, he believed that monitoring an inmate call on institution equipment in a maximum security facility was proper and legal, and he stated that he retains that belief today. Defendants Gunther and Brown also believed that it was proper to monitor Campiti's call.

Turning from the facts of this case to the legal claims raised by plaintiffs, I am mindful of the deference traditionally paid by federal courts to decisions made by prison administrators, particularly where state penal institutions are involved. *E. g., Procunier v. Martinez,* 416 U.S. 396, 404–405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). I also take note of the countervailing doctrine that "a prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Nolan v. Fitzpatrick,* 451 F.2d 545, 547 (1st Cir. 1971), *quoting Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944), *cert. denied,* 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945).

Plaintiffs' initial claim is that defendants' actions violated the federal wiretap statute. Title III provides a civil remedy when communications are unlawfully intercepted or disclosed. 18 U.S.C.A. § 2520 states in pertinent part that:

> Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications.

The clear language of this statute brings defendants within its reach. *Cf. United States v. Harrigan,* 557 F.2d 879, 885 n. 5 (1st Cir. 1977). In the definitional section of Title III, 18 U.S.C.A. § 2510(4), "interception" is defined as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." Under that language, Walonis has "intercepted" the disputed call, and Gunther and Brown have "procure[d]" Walonis' interception. Additionally, defendant Hall comes within the ambit of § 2520 because he "disclose[d]" or "procure[d]" the disclosure of the unlawfully intercepted call.

Defendants contend that their interception of plaintiffs' call was justified because it was part of routine prison surveillance. However, the statute unequivocally states: "[e]xcept as specifically provided interception of '*any* wire or oral communication' is illegal." 18 U.S.C.A. § 2511(1)(a) (emphasis added). As the Supreme Court stated in *United States v. Giordano,* 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974), "[t]he purpose of the legislation . . . was effectively to prohibit . . . all interceptions of oral and wire communications, except those specifically provided for in the Act . . . ." Thus, defendants' argument that Congress intended to exclude routine prison surveillance from the statute fails. There is nothing in the language of Title III or its legislative history to justify such exclusion from liability. *See generally* 1968 U.S.Code Cong. & Admin. News, pp. 2112, 2153–2163, 2177–2197. It is well-recognized that "Congress enacted Title III to protect the privacy of all persons conversing over the telephone . . . ." *United States v. Jones,* 542 F.2d 661, 670 (6th Cir. 1976).

Furthermore, I rule that none of the express exemptions from 18 U.S.C.A. § 2511 is applicable to this case. Defendants have not carried their burden of establishing that either Campiti or Pioggia consented to the call so as to bring its monitoring within subsection (2)(c) of 18 U.S.C.A. § 2511, which provides in relevant part: "It shall

not be unlawful under this chapter for a person . . . to intercept a wire . . communication, where . . . one of the parties to the communication has given prior consent to such interception." The mere fact a phone call is made within a prison should not alter a person's expected privacy in a phone conversation, nor grant implied consent to interception. *People v. Tebo*, 37 Mich.App. 141, 194 N.W.2d 517, 521 (1972).

■ Defendants also claim that the "common carrier" exemption contained in 18 U.S.C.A. § 2511(2)(a)(i) justifies their actions. That subsection provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided*, That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

This exemption is intended to permit "telephone companies to engage in reasonable activities to protect their property," *United States v. Freeman*, 524 F.2d 337, 340 (7th Cir. 1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976), through limited monitoring of the lines of suspected illegal users, *United States v. Clegg*, 509 F.2d 605 (5th Cir. 1975). Moreover, the statute's proviso restricting random monitoring suggests that this exemption should be limited in scope. Accordingly, I rule that neither the Commonwealth of Massachusetts nor defendants as employees thereof come within the "common carrier" exemption.

■ Defendants also seek to deny liability on the grounds that their actions were taken in good faith. Section 2520 provides such a statutory defense: "good faith re-

liance on a court order or legislative authorization shall constitute a complete defense to any civil action brought under this chapter . . . ." Under the plain meaning of this clause, defendants are not entitled to its protection, since they neither alleged nor attempted to prove legislative authorization for their actions, and it is undisputed that no court order of authorization was ever issued. *Cf. Zweibon v. Mitchell*, 170 U.S. App.D.C. 1, 74, 516 F.2d 594, 670 (1975) (en banc), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

■ I turn next to plaintiffs' state law claims. Like its federal counterpart, M.G. L.A. ch. 272, § 99(Q), provides a civil remedy for unlawful wiretapping. Under § 99, the term "interception" means "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire . . . communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." M.G.L.A. ch. 272, § 99(B)(4) (emphasis added). As so defined, I rule defendants' conduct violated the state statute. Defendants contend that the inclusion of the term "secretly" in the state statute excuses their actions. The essence of that argument is the assertion that plaintiffs had knowledge of the monitoring, so that it was not done secretly. The Supreme Judicial Court, however, in construing § 99, has stated that a caller needs to have "actual knowledge" of interception for monitoring to not rise to the level of violation of the statute. *Commonwealth v. Jackson*, 1976 Mass.Adv.Sh. 1587, 1594, 349 N.E.2d 337, 340. The Court further stated that actual knowledge requires "clear and unequivocal objective manifestations of knowledge." *Id.* Here, plaintiffs' conduct in no way manifests knowledge, so I rule that the monitoring was done secretly and thus constitutes an illegal "interception."

Although the Massachusetts statute parallels the federal statute in providing exemptions from liability, I rule that none of the exemptions in § 99(D) of ch. 272 covers the facts of this case.

Lastly, defendants again raise a good-faith immunity defense under the state statute in reliance on *Gildea v. Ellershaw*, 363 Mass. 800, 298 N.E.2d 847 (1973). In that case, the Court held the law of the Commonwealth to be: "if a public officer . . . is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision . . . ." *Id.* at 820, 298 N.E.2d at 858. The problem with this argument is that § 99 addresses a good faith defense as follows: "Good faith reliance on a warrant issued under this section shall constitute a complete defense to an action brought under this paragraph." M.G.L.A. ch. 272, § 99(Q)(3). The fact that defendants' actions were warrantless precludes their arguing they acted in good faith.

Accordingly, I rule that all defendants have violated federal and state law and that a hearing will be held on the question of damages. Plaintiffs have also sought injunctive relief. My reading of the legislative history of 18 U.S.C.A. § 2520 leads me to believe that Congress did not intend that any relief other than money damages be available under the statute. *E. g.*, 1968 U.S.Code Cong. & Admin.News, p. 2196. Likewise, there is nothing before me which suggests that the parallel state statute permits any equitable relief. More importantly, I find no evidence in the record of this case to suggest that any defendant involved herein will repeat the conduct involved. Consequently, I rule there is no need for an injunction even if it were authorized.