UNITED STATES of America,
Plaintiff-Appellee,

v.

Susan PAUL (79–5061),
Defendant-Appellant,

and

Arnold Chester Pierce (79–5082),
Defendant-Appellant.

Nos. 79–5061, 79–5082.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 9, 1979.

Decided Jan. 24, 1980.

Edwin J. Walbourn, III, Lexington, Ky., for defendant-appellant in No. 79–5061.

Stephany Tsanges, Covington, Ky., for defendant-appellant in No. 79–5082.

Patrick H. Molloy, U.S. Atty., Robert F. Houlihan, Jr., Asst. U.S. Atty., Lexington, Ky., for plaintiff-appellee.

Before CELEBREZZE and KEITH, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

KEITH, Circuit Judge.

On March 30, 1978, Corrections Officers at the Ashland Kentucky Federal Correctional Institution monitored a telephone conversation between inmate Arnold Pierce and an unidentified female.[1]  The Officers overheard Pierce tell the woman to "bring the material," and that he would "have the money."  The next morning, Corrections Officers stopped and searched Pierce and removed a $5.00 bill from his person.  In addition, one Susan Paul presented herself

---

1. The central control room of the prison is equipped with speakers which can be switched on to monitor each of the telephones provided for inmate use within the institution.  Appar-ently, all incoming and outgoing calls are routed through the control room where the prison switchboard is located.

at the institution to visit Pierce. Paul was taken to the Warden's office and strip searched, but no contraband was found.

Later that day, Corrections Officers monitored a conversation between inmate Bill Grimes and a woman identified as Susan. The woman stated that she was scared in that she had been taken to the Warden's office, but that she "had ditched the stuff under the chair and they didn't find anything on her." The Warden's office was searched and a quantity of hashish found. Based largely on the above testimony, Pierce and Paul were tried and convicted of violating 18 U.S.C. § 1791, which makes it unlawful for anyone to introduce, on the grounds of a federal prison, anything contrary to a rule of the Attorney General.

The sole question raised on appeal is whether the district court erred in refusing to suppress testimony regarding the monitored telephone conversations. Defendants contend that the government monitoring violated Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 et seq. The issue before us is whether Title III applies to the monitoring of telephone calls to or from inmates at a prison and, if so, whether Title III was violated.

We note that defendants' claim is purely statutory. It still appears to be good law that so far as the Fourth Amendment is concerned, jail officials are free to intercept conversations between a prisoner and a visitor. This was the ruling in *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962) and it appears to have survived *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See United States v. Hearst*, 563 F.2d 1331, 1344–46 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

Title III's broad prohibition on most forms of warrantless wiretapping presents a more troublesome issue, however. We do not question the government's need to monitor prisoners' telephone calls as a security measure. *Cf. Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Nor do we doubt that the result of a ruling invalidating such monitoring would result in the elimination of telephone privileges for many prisoners. The problem is that Congress apparently never specifically considered the issue which is before us when it passed Title III.[2]

The government takes the broad view that Title III does not apply at all because it was merely intended to codify the Supreme Court's constitutional decisions in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States, supra*. According to the government, surveillance which does not require a warrant under the Fourth Amendment should be automatically permissible under Title III.

We have problems with this view. It is true that Congress passed Title III in response to *Berger* and *Katz*. However, the statutory language speaks for itself and covers areas not addressed in *Berger* or *Katz*. *See e. g. Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (construing Title III's requirement that agents minimize the interception of irrelevant conversations); *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977) (construing Title III's requirements that the government identify probable wiretap subjects and that it give subsequent notice to those whose conversations were intercepted); *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40

---

2. By its express terms, Title III prohibits judicially unauthorized interception of "any wire or oral communication." 18 U.S.C. § 2511(1)(a). The statute contains no specific exception for wiretapping at a prison. *See Campiti v. Walonis*, 453 F.Supp. 819 (D.Mass.1978), *aff'd*, 611 F.2d 387 (1st Cir. 1979).

Judge Phillips' typically well-written concurring opinion points out very well what the problem is with Title III in this area. Congress indicated approval of *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), in one part of the legislative history dealing with oral conversations, but wrote the statute in such a way that prison wiretapping is necessarily included within its ambit. We do not feel that we can disregard the plain meaning of the statute. *See United States v. Jones*, 542 F.2d 661, 666–72 (6th Cir. 1976) (Celebrezze, J.).

L.Ed.2d 341 (1974) (construing Title III's requirements that the Attorney General or a specifically designated Assistant Attorney General approve a wiretap application); *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (same); *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) (construing Title III's requirement that no illegally overheard information be used by a grand jury).

The government relies upon *Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 21 n.46, 516 F.2d 594, 614 n.46 (D.C.Cir.1975) (en banc), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) where the court stated that where "no warrant is constitutionally mandated, Congress did not intend to impose a statutory warrant requirement." However, that case dealt only with Title III's express national security wiretap exemption, 18 U.S.C. § 2511(3) and its specific legislature history. It is clear that so far as national security wiretapping is concerned, Congress meant for Title III to be coextensive with the Constitution.[3] There is no indication in Title III that Congress had the same intention regarding prison wiretapping.

The district court took the view that Title III did apply, but that the prison monitoring was excepted under 18 U.S.C. § 2510(5)(a) which excludes from the ambit of Title III the interception of communications over equipment used by "an investigative or law enforcement officer in the ordinary course of his duties . . ." *See* 1968 U.S. Code Congressional and Administrative News, pp. 2112, 2178–79.

We agree with the district court. The monitored calls in this case came in over the prison switchboard and were then routed to telephones provided for inmate use within the institution. The district court found that the telephone monitoring took place pursuant to a policy statement issued by the Federal Bureau of Prisons as well as local prison rules. Although the issue was disputed, the court found that the telephone

rules were posted and that the inmates had reasonable notice that monitoring of telephone conversations might occur.

Under these circumstances, we conclude, as did the district court, that the monitoring took place within the ordinary course of the Correctional Officers' duties and was thus permissible under 18 U.S.C. § 2510(5)(a). This factual situation distinguishes the only other case we have found on the prison wiretapping question, *Campiti v. Walonis*, 453 F.Supp. 819 (D.Mass.1978), *aff'd*, 611 F.2d 387 (1st Cir. 1979). There, the monitoring was not shown to be related to prison security and was not done pursuant to a posted prison regulation. *See also United States v. Harpel*, 493 F.2d 346 (10th Cir. 1974) (telephone extension at police station could not be used to record a private conversation between two other law enforcement officers without authorization or consent.) *Compare Briggs v. American Air Filter Co.*, 455 F.Supp. 179 (N.D.Ga.1978) (company's surreptitious monitoring of one of its extension phones permissible because it was done in the ordinary course of its business.)

District Judge Hermansdorfer properly denied the motion to suppress. The judgments of conviction are affirmed.

HARRY PHILLIPS, Senior Circuit Judge (concurring in the result).

While I agree with the majority opinion that the district court properly denied the defendants' motion to suppress, I do so on different grounds than those expressed in the majority opinion. I am convinced that Congress never intended Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (herein cited as Title III) to apply to prisons. Accordingly, I would hold that the warrantless monitoring in this case did not violate Title III, regardless of whether it can be said to fall within the language of one of the statutory exceptions.

Congress enacted Title III with the dual purpose of

---

**3.** Congress has recently amended Title III and delineated specific procedures for approval of National Security Wiretapping. *See* 50 U.S.C. § 1801 *et seq.*

(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* [1968] U.S. Code Cong. & Admin.News pp. 2112, 2153 (hereinafter cited as S.Rep. No. 1097 with page references to [1968] U.S.Code Cong. & Admin.News).

Congress had a specific problem in mind when it enacted Title III:

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken work relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage. S.Rep. No. 1097 U.S.Code Cong. & Admin.News 1968, at 2154.

Surveillance conducted to maintain internal prison security lies distinctly outside the threat to privacy that Title III was designed to address. In *Lanza v. New York*, 370 U.S. 139, 143, 82 S.Ct. 1218, 1221, 8 L.Ed.2d 384 (1962), the Supreme Court said:

But to say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's "house," and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day. (Footnotes omitted.)

*See United States v. Hearst*, 563 F.2d 1331, 1345 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978) (holding that *Lanza* is still good law and citing cases). *Cf. Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974) (holding: "The identifiable governmental interests . . . in . . . the preservation of internal order and discipline [and] the maintenance of institutional security against escape or unauthorized entry" justify censoring prisoners' mail).

Moreover, Congress recognized that the realities of the prison environment mandate that officials be able to monitor prisoners' conversations with visitors and other inmates. Thus, Title III defines "oral communications", whose warrantless monitoring is prohibited, to exclude conversations that occur in circumstances which do not justify an expectation of privacy:

The definition is intended to reflect existing law. See *Katz v. United States*, 88 S.Ct. 507, 389 U.S. 347 [19 L.Ed.2d 576] (1967). Compare *United States v. South-Eastern Underwriters Assn.*, 64 S.Ct. 1162, 322 U.S. 533 [88 L.Ed. 1440] (1944) with *Lee v. Florida*, 191 So.2d 84 ([Fla. App.] 1966), *certiorari granted* [392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166], Jan. 15, 1968, No. 174, 1967 Term. The per-

son's subjective intent or the place where the communication is uttered is not necessarily the controlling factor. Compare *Linnell v. Linnell* [249 Mass. 51], 143 N.E. 813 (Mass.1924), with *Freeman v. Freeman* [238 Mass. 150], 130 N.E. 220 (Mass. 1921). Nevertheless, such an expectation would clearly be unjustified in certain areas; for example, a jail cell (*Lanza v. New York*, 82 S.Ct. 1218, 370 U.S. 139 [8 L.Ed.2d 384] (1962)) or an open field (*Hester v. United States*, 44 S.Ct. 445, 265 U.S. 57 [68 L.Ed. 898] (1924)).

S.Rep. No. 1097 U.S.Code Cong. & Admin. News 1968, at p. 2178. *See* 18 U.S.C. § 2510(2).

Unfortunately for the courts and prison officials, Congress did not include the same clarifying language in Title III's definition of "wire communication", 18 U.S.C. § 2510(1):

(1) "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

To the contrary, the legislative history states that the definition's "coverage is intended to be comprehensive." S.Rep. No. 1097, U.S.Code Cong. & Admin.News 1968, at p. 2178.

This unfortunate choice of words has already produced at least one absurd result. In *United States v. Hall*, 488 F.2d 193, 197 (9th Cir. 1973), the Ninth Circuit held that a conversation communicated between two radio transceivers is like an oral conversation and must meet the justifiable-expectation-of-privacy requirement, but that the addition of a land-line telephone to one end of the conversation makes it a wire communication not subject to the expectation requirement. The court said:

We realize that our classification of a conversation between a mobile and a land-line telephone as a wire communication produces what appears to be an absurd result. These conversations were intercepted by an ordinary radio receiver and not by a phone tap. Logically they should be afforded no more protection than those occurring between two radio transceivers. They should be oral communications. However, Congress's definition of a wire communication necessitates this conclusion.

I am concerned that the majority opinion in the present case produces an equally anomalous result: Prison officials are free to monitor inmate conversations conducted face to face with visitors or inmates, but must obtain a warrant or argue that a statutory exception applies in order to monitor the same conversations conducted over prison telephones.

Moreover, the holding creates new problems for prison administrators. Title III specifically enumerates the criminal offenses whose investigation may justify issuance of a warrant. Smuggling contraband into a prison, the offense charged in the present case, and one of the most serious threats to prison security, is not among them. As I read the majority opinion, the court holds today that, unless prison officials bring their actions within a statutory exception, they may not monitor prisoners' telephone conversations for security purposes. Furthermore, the court's holding could subject prison officials to the possibility of civil damage actions, 18 U.S.C. § 2520, and even criminal penalties, 18 U.S.C. § 2511(1). *See* 18 U.S.C. § 2510(6) (defining "person" to include both state and federal employees). I find nothing in the statute or the legislative history to justify that result.

It seems clear to me that Congress phrased Title III's definition of "wire communication" in relatively absolute language because it was not thinking in terms of cell block telephones. In *United States v. Hall, supra*, 488 F.2d at 196, the Ninth Circuit said:

Obviously, there is a reason for the more restrictive definition of oral communications. When a person talks by telephone, he can reasonably assume privacy. That assumption may often be invalid for non-wire communications. Therefore, it is incumbent upon the participants in an oral communication to make a reasonable estimate of the privacy afforded them by their particular circumstances.

A prison inmate has no reasonable basis for assuming that his or her telephone conversations will be private.

I would read Title III's definition of "wire communication" not to include prison telephone conversations. Such a limited exception would not open the door to erosion of Title III's intended protections. Prison security poses unique problems that justify unique restrictions of individual rights. *See Procunier v. Martinez, supra,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224; *Lanza v. New York, supra,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384. Furthermore, such an exception would effectuate fully the intent of Congress to protect individual privacy. Most ·importantly, the construction I propose would avoid saddling prison administrators with yet another "Herculean obstacle" to effective discharge of their duties. *See Procunier v. Martinez, supra,* 416 U.S. at 404, 94 S.Ct. 1800.

So read, Title III would not apply to monitoring of prison telephone conversations. On that basis, I agree with the majority that the district court's refusal to suppress evidence in this case should be affirmed.

Let me add that it is with some trepidation that I disagree with an opinion prepared by Judge Damon J. Keith in an area of telephone wiretaps. As a district judge he was the author of the opinion in the landmark case of *United States v. Sinclair,* 321 F.Supp. 1074 (E.D.Mich.1971), generally known as the "Keith case." I concurred in our court's majority opinion of affirmance. *United States v. United States District Court for the Eastern District of Michigan,* 444 F.2d 651 (6th Cir. 1971). The Supreme Court affirmed in 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).