223 N.J. Super. 531 (1988)
539 A.2d 301
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES FORNINO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1987.
Decided February 16, 1988.
*532 Before Judges PRESSLER, MUIR, Jr. and SKILLMAN.
Leonard Ginsberg, Designated Counsel, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney; Leonard Ginsberg, on the brief).
*533 Robert E. Bonpietro, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; Robert E. Bonpietro, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
Defendant was indicted together with two others for second degree conspiracy to commit the crimes of escape and murder, in violation of N.J.S.A. 2C:29-5, N.J.S.A. 2C:11-1 et seq. and N.J.S.A. 2C:5-2 (count I), second degree attempted murder, in violation of N.J.S.A. 2C:11-3, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:5-1 (count II), and second degree attempted escape, in violation of N.J.S.A. 2C:29-5, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:5-1.
The charges arose out of a plan for the forcible escape from Rahway State Prison of codefendant Carmen Michael La Bruno. La Bruno and another inmate, Joseph Satkin, were both transported out of the prison on a regular basis for medical treatment. The plan called for defendant, James Fornino, to kill the guards who accompanied the inmates on one of these trips and to free La Bruno and Satkin. La Bruno's father, codefendant Carmen La Bruno, Sr., also was involved in making arrangements for the escape.[1]
La Bruno discussed these escape plans with Satkin in November and December of 1982 and solicited his participation. La Bruno asked Satkin to arrange for the payment of $10,000 to defendant. However, Satkin informed prison officials of the plans and thereafter cooperated in gathering the evidence on which criminal charges ultimately would be based.
The State Police had Satkin tell La Bruno that a friend of his called "Louie K," (actually an undercover trooper) would deliver the money Satkin had been asked to pay defendant. On the *534 night before the escape was to be committed, the trooper posing as "Louie K" met with defendant and La Bruno, Sr. at a diner in Hoboken. As the three men were leaving the diner, the trooper made the agreed payment to defendant. Shortly thereafter, defendant was arrested.
Before the jury which was to try the three defendants was sworn, the prosecutor disclosed that several telephone calls made by La Bruno from Rahway State Prison regarding the planned escape had been monitored by prison officials without a warrant. Defense counsel argued that this telephone monitoring was illegal and might require dismissal of the charges. Anticipating that resolution of the issues raised by the telephone monitoring might consume a substantial amount of time, the trial court declared a mistrial.
Several months later, an evidentiary hearing was held on motions by defendant and his codefendants to suppress the evidence obtained through the telephone calls intercepted without a warrant. At the conclusion of the hearing, the trial court denied the motions.
During the hearing on the motion to suppress, La Bruno and La Bruno, Sr. pled guilty to count I of the indictment (conspiracy to commit the crimes of escape and murder).[2] Consequently, the charges against the La Brunos were severed and only defendant was tried.
A jury found defendant guilty on all charges. The trial court merged the conspiracy convictions into the convictions for attempted escape and attempted murder. On the conviction for attempted murder, defendant was sentenced to an extended term of 20 years, with 9 years of parole ineligibility. On the *535 conviction for attempted escape, defendant was sentenced to a concurrent term of 10 years, with 5 years of parole ineligibility.
On appeal defendant makes the following arguments:[*]
POINT I: NO RATIONAL TRIER OF FACT COULD HAVE FOUND THE DEFENDANT GUILTY OF ATTEMPTED MURDER OR ATTEMPTED ESCAPE BEYOND A REASONABLE DOUBT ON THE EVIDENCE PRESENTED BY THE STATE.
* * * * * * * *
POINT II: NO RATIONAL TRIER OF FACT COULD HAVE FOUND THE DEFENDANT GUILTY OF CONSPIRACY BEYOND A REASONABLE DOUBT ON THE EVIDENCE PRESENTED BY THE STATE (NOT RAISED BELOW).
* * * * * * * *
POINT VIII: THE MOTION TO SUPPRESS SHOULD HAVE BEEN GRANTED.
* * * * * * * *
POINT X: `THE INSTRUCTIONS TO THE JURY WERE ERRONEOUS (PARTIALLY RAISED BELOW).
* * * * * * * *
B. THE CHARGE FAILED TO CLARIFY THAT PREPARATION IS INSUFFICIENT TO SUSTAIN A CONVICTION FOR AN ATTEMPT (NOT RAISED BELOW).
* * * * * * * *
POINT XII: DEFENDANT HAD INEFFECTIVE ASSISTANCE OF COUNSEL (NOT RAISED BELOW).
* * * * * * * *
We reject all the arguments made by defendant and affirm the judgment of conviction. The only arguments which require discussion are contained in points I, II, VIII, X(B) and XII of defendant's brief. Defendant's other arguments are clearly without merit. R. 2:11-3(e)(2).

*536 I
Defendant's first point is that the evidence was insufficient to support a finding of guilt of attempted murder or attempted escape. His second point is that the evidence was insufficient to support a finding of guilt of conspiracy to commit murder. Since defendant entered into a conspiracy with the La Brunos before taking any steps to carry out that conspiracy, it is appropriate to consider defendant's first two points in reverse order.
There is ample evidence from which the jury could conclude that the conspiracy into which defendant entered involved a plan not only for the escape of La Bruno and Satkin but also for the murder of the correction officers guarding them. Satkin testified that La Bruno told him that the plan was for defendant to overpower the guards and kill them. Handguns equipped with silencers were to be used for this purpose. Satkin further testified that La Bruno had told him that La Bruno, Sr. and defendant had surveyed the woods behind the doctor's office where the escape was to occur in order to find a place to dispose of the guards' bodies. Some corroboration of Satkin's testimony was provided by statements made by La Bruno while riding in a van with Satkin on the day of the planned escape, which were surreptitiously recorded by the State Police. For example:
[Satkin]: Three bullets can't even hit, knock that motherfucker [referring to one of the guards] out.
[La Bruno]: Your ass, Joe. Are you nuts? They'll blow him right out of his fucking shoes. Are you wacked out?
Defendant also made several statements which provide inferential support for the conclusion that he intended to kill the guards. During the meeting in the diner where he received the payment for his part in the planned escape, defendant said:
Problems, problems, you get out of the way. Just get them out of the way. Whatever way you gotta do it you get them out of the way.
* * * * * * * *

*537 You know. Like I said before, you know, if you got an obstacle, you get it out of your way. You know, you ah accomplish your goal and ah you ah get all your obstacles out of your way to accomplish your goal, right?
A reasonable jury, viewing this evidence most favorably to the State, could conclude that defendant and his coconspirators planned to kill the guards in carrying out the escape.
The more difficult question is whether the evidence was also sufficient for the jury to conclude that defendant took sufficient steps in carrying out the conspiracy to have committed attempted escape and attempted murder. N.J.S.A. 2C:5-1 provides in pertinent part as follows:
a. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he: ...
(3) Purposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.
b. Conduct shall not be held to constitute a substantial step under subsection a.(3) of this section unless it is strongly corroborative of the actor's criminal purpose.
The 1971 report of the New Jersey Criminal Law Revision Commission which drafted the Code of Criminal Justice indicates that the intent of N.J.S.A. 2C:5-1 was to expand the scope of criminal responsibility for attempts:
New Jersey's cases adopt a rule which has become known as "the probable desistance test." ... It provides that the actor's conduct constitutes an attempt if, in the ordinary and natural course of events, without interruption from an outside source, it will probably result in the crime intended. The test requires a judgment, in each case, if an attempt is to be found, that the actor had reached a point where it was unlikely that he would have voluntarily desisted from his efforts to commit the crime. The leading case is State v. Schwarzbach [84 N.J.L. 268 (1313)], supra ("The overt act or acts must be such as will apparently result, in the usual and natural course of events, if not hindered by extraneous causes, in the commission of the crime itself. Mere pre-preparations are not the overt acts required").... We reject this, as well as several other tests, as the standard for distinguishing preparations from attempts. [1971 New Jersey Penal Code Commentary, Vol. II, at 116-117].
The Commission's reformulation of the law of attempt contained in N.J.S.A. 2C:5-1(a)(3) and (b) is taken from the substantially *538 similar language of the Model Penal Code.[3] Accordingly, the Commission's report describes the intent of these provisions by quoting the pertinent part of the report of the drafters of the Model Penal Code as follows:
First, this formulation shifts the emphasis from what remains to be done  the chief concern of the proximity tests  to what the actor has already done. The fact that further major steps must be taken before the crime can be completed does not preclude a finding that the steps already undertaken are substantial. It is expected, in the normal case, that this approach will broaden the scope of attempt liability.
Second, although it is intended that the requirement of a substantial step will result in the imposition of attempt liability only in those instances in which some firmness of criminal purpose is shown, no finding is required as to whether the actor would probably have desisted prior to completing the crime....
* * * * * * * *
In addition to assuring firmness of purpose, the requirement of a substantial step will remove very remote preparatory acts from the ambit of attempt liability and the relatively stringent sanctions imposed for attempts. On the other hand, by broadening liability to the extent suggested, apprehension of dangerous persons will be facilitated and law enforcement officials and others will be able to stop the criminal effort at an earlier stage  thereby minimizing the risk of substantive harm  without providing immunity for the offender. [New Jersey Penal Code Commentary, supra, at 117-118].
Under the expanded scope of attempt liability incorporated into the Code, there was sufficient evidence for the jury to conclude that defendant had taken substantial steps which were strongly corroborative of the "firmness of his purpose" to carry out the plan to kill the correction officers assigned to guard La Bruno and to free him from custody. Defendant, in the company of La Bruno, Sr., had visited the doctors' office where the escape was supposed to occur and had surveyed a wooded area behind the office where the bodies of the murdered guards could be disposed. Furthermore, he arranged a meeting the night before the planned escape with the person he believed *539 was to pay him for his part in the crime and he in fact accepted the agreed upon payment.
The conclusion that defendant had gone far enough in carrying out the planned escape to be found guilty of attempted escape and attempted murder is supported by our decision in State v. Jovanovich, 174 N.J. Super. 435 (Resent. Panel 1980), aff'd 181 N.J. Super. 97 (App.Div. 1981). There we held that an individual could be found guilty of attempted arson for soliciting another person to burn his building and describing to that person the layout and type of construction of the building. We reached this conclusion even though the defendant had not yet obtained the insurance on the premises which it was the object of the planned arson to collect, had not paid the other person for the commission of the crime, and had not planned to go through with the arson if foreclosure proceedings on the premises could be terminated.
Additional support for our conclusion is provided by decisions in other jurisdictions which have recognized that the reconnaissance of the planned site of a crime and the payment of money for its commission are substantial steps in a course of conduct planned to culminate in a crime. In United States v. Martinez, 775 F.2d 31 (2nd Cir.1985), defendant, an inmate in federal prison, solicited another inmate, who was a government informant, to arrange for the murder of a third inmate in another institution. After the informant told defendant that the murder could be arranged, defendant gave him $350 as "an advance" for commission of the crime. Defendant later equivocated as to whether he wanted the crime committed and the informant returned the $350 to him. However, the court determined that the original solicitation of the commission of the crime and payment of the "advance" constituted attempted murder. In State v. Manchester, 213 Neb. 670, 331 N.W.2d 776 (Sup.Ct. 1983), the court affirmed a conviction for attempted murder based upon defendant's solicitation of a person to commit the crime, arranging for a weapon, setting aside the payment for the crime in a billfold, and showing the killer the *540 victim, his residence, and his place of work. In United States v. Ivic, 700 F.2d 51, 67 (2nd Cir.1983), the court affirmed a conviction for an attempt to use explosives based on discussions of how to plant explosives at the site of the planned crime, the reconnaissance of the crime scene, the acquisition of explosives, and an authorization by the leader of the group to commit the crime, even though no explosives were ever transported to the scene of the planned crime. In United States v. Brown, 604 F.2d 347, 350 (5th Cir.1979), cert. den. 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980), the court upheld a conviction for an attempt to destroy a building based solely on evidence that the defendant had made arrangements for the purchase of explosives and had sent the persons who were to commit the crime to inspect the building.
In short, both the comments of the Criminal Law Revision Commission which proposed enactment of N.J.S.A. 2C:5-1(a)(3) and (b) and the cases which have applied the expanded concept of attempt embodied in these provisions demonstrate that even if further major steps are required before a crime can be completed, or the accused had ample opportunity to desist prior to completing the crime, a jury can still conclude that an attempt has been committed. Thus, even though substantial additional steps were required before the escape of La Bruno could be accomplished and defendant still had the opportunity to change his mind and not to commit the crime or to depart from his plan with La Bruno and not to kill the guards, defendant's visits to the scene of the planned crime and his receipt of money for its commission could properly be found by the jury to constitute "substantial steps in a course of conduct planned to culminate in the commission of the crime" which were "strongly corroborative of the actor's criminal purpose." Accordingly, we reject defendant's argument that the evidence was insufficient to find him guilty of attempted murder and attempted escape.
*541 For the same reason, we reject the argument made in Point X(B) of defendant's brief that the trial court committed reversible error by not instructing the jury that "preparation is insufficient to sustain a conviction for an attempt." Defendant did not request such an instruction or object to its omission by the trial court. Consequently, the failure to give this instruction would be grounds for reversal only if it were plain error. State v. Hock, 54 N.J. 526, 538 (1969). We find no such error here.
The trial court instructed the jury that, in order to establish defendant's guilt of an attempt, the State was required to show that he
... did or omitted to do anything which under the circumstances as a reasonable person would believe him [sic] to be is an act or omission constituting a substantial step in the course of conduct planned to culminate in the commission of the crime.
In other words, this element requires that the defendant either purposely performed or failed to perform an act which is a positive step toward the commission of the crime, however, the step taken must be one which is strongly corroborative of the defendant's criminal purpose.
This instruction accurately reflected the language of N.J.S.A. 2C:5-1(a)(3) and N.J.S.A. 2C:5-1(b).
We further note that any statement to the effect that mere preparation for the commission of a crime is not an attempt would be potentially misleading. Under the expanded concept of attempt embodied in N.J.S.A. 2C:5-1(a)(3) and (b) "... some preparation may amount to an attempt. It is a question of degree." State v. Mandujano, 499 F.2d 370, 377 (5th Cir.1974), cert. den. 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), quoting United States v. Coplon, 185 F.2d 629, 633 (2nd Cir.1950). It is only "very remote preparatory acts" which are excluded from the ambit of attempt liability. New Jersey Penal Code Commentary, supra, at 118. Accordingly, we conclude that the trial court did not commit plain error in not instructing the jury that mere preparation for the commission *542 of a crime does not constitute an attempt.[4]

II
Defendant moved to suppress any evidence obtained through the interception of two sets of telephone calls made by La Bruno. The first set of calls were made on January 13 and 14, 1983 on phones belonging to an inmate organization called New Directions. Defendant argued that the warrantless interception of these calls violated the New Jersey Wiretapping and Electronic Surveillance Act, N.J.S.A. 2A:156A-1 et seq., Title III of the Federal Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 et seq., and the Fourth Amendment to the United States Constitution. The second set of calls, which were made on January 22, 23 and 24, 1983 from "public" phones in the prison located in cell block "2 down," were intercepted pursuant to wiretap authorizations issued by the court on January 21, 1983. Defendant argued that although the telephone calls on the New Directions phones previously intercepted by the prison *543 officials were not expressly mentioned in the wiretap application, the application incorporated the information obtained through those interceptions and thus was tainted by the illegality of the warrantless telephone interceptions.
After a three day hearing, the trial court denied defendant's motion to suppress. It concluded in an oral opinion that the monitoring of the calls made by La Bruno on the New Directions telephone was not an "interception" within the meaning of N.J.S.A. 2A:156A-2(d)(1) and 18 U.S.C. § 2510(5)(a).[5] The court also concluded that La Bruno had no constitutional right to notice of the monitoring of the New Directions phone installation. Consequently, the trial court upheld the validity of the monitoring of La Bruno's calls on January 13th and 14th. Moreover, the court concluded that even if the monitoring of those calls had been illegal, that would not require suppression of the telephone calls intercepted on January 22, 23 and 24 pursuant to wiretap authorizations. The court accepted as credible the testimony of the state trooper whose affidavit was submitted in support of the wiretap application that he did not include in that affidavit any information gained from the monitoring of La Bruno's calls on the New Directions phone. Thus, there was no "fruit of the poisonous tree" problem with respect to the affidavit submitted in support of the wiretap authorization.
Title III of the Federal Omnibus Crime Control Act and Safe Streets Act, 18 U.S.C. § 2510 et seq., which was enacted in 1968, P.L. 90-351, Title III, § 802, 82 Stat. 212, applies to any interception of a telephone call, regardless of whether parallel state legislation has been enacted. United States v. Smith, 726 F.2d 852, 860-861 (1st Cir.1984). The New Jersey Wiretapping *544 and Electronic Surveillance Act, N.J.S.A. 2A:156A-1 et seq., which was enacted in 1969, L. 1968, c. 409, was modeled after the federal legislation. See In re Wire Communication, 76 N.J. 255, 262 (1978). The New Jersey act is more restrictive than the federal act in some respects. See State v. Catania, 85 N.J. 418, 436-439 (1981). However, the sections of the federal and state acts relied upon by defendant are substantially similar in language. Therefore, we are satisfied that the Legislature's intent in enacting the sections of the Wiretapping and Electronic Surveillance Act pertinent to this case was simply to follow the federal act.
N.J.S.A. 2A:156A-1, et seq. and 18 U.S.C. § 2510, et seq. provide that generally telephone calls and other wire or oral communications may not be "intercepted" except pursuant to court order. See N.J.S.A. 2A:156A-8; 18 U.S.C. § 2516. At the time of the monitoring of La Bruno's calls, N.J.S.A. 2A:156A-2(c) and 18 U.S.C. § 2510(4) defined "intercept" as "the aural acquisition of any wire or oral communication through the use of any electronic, mechanical or other device." (Emphasis added).[6]N.J.S.A. 2A:156-2(d) defined the term "intercepting device" as "any device or apparatus ... that can be used to intercept a wire or oral communication." The term "electronic, mechanical or other device" was defined by 18 U.S.C. § 2510(5) in virtually the same language. However, N.J.S.A. 2A:156A-2(d)(1) and 18 U.S.C. § 2510(5) provided an exception from their respective definitions of "intercepting devices" and "electronic, mechanical or other device" for
any telephone ... equipment ... furnished to the subscriber or user by a communication carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; ... or being used *545 ... by an investigative or law enforcement officer in the ordinary course of his duties....
We agree with the conclusion reached by Judge Hoffman in his comprehensive oral opinion that the telephone equipment used by the correction officers at Rahway Prison to monitor La Bruno's calls on January 13 and 14, 1983 fits within this exception. The telephone on which La Bruno's calls were made was installed in 1978 for the use of New Directions, an inmate group at the prison. At the same time, with the consent of New Directions the telephone company installed equipment to enable prison officials to monitor calls on this telephone. Similar monitoring equipment was installed on the telephones of all other inmate groups. A primary reason for the installation of monitoring equipment of the telephones of inmate groups was the maintenance of prison security, and correction officers used this equipment on a regular basis. Thus, the monitoring equipment was furnished by the telephone company in the ordinary course of its business. Cf. Jandak v. Village of Brookfield, 520 F. Supp. 815, 822 (N.D.Ill. 1981). Likewise, the correctional officers who used the monitoring equipment may be appropriately viewed as law enforcement officers acting "in the ordinary course of their duties." See Crooker v. U.S. Dep't of Justice, 497 F. Supp. 500, 503 (D.Conn. 1980).
We assign no significance to the fact that La Bruno's calls on the New Directions telephone were monitored because of information supplied by Satkin regarding the planned escape rather than on a random basis, or that the officers who did the monitoring were not regularly assigned to perform that duty. The exception from the definitions of "intercepting devices" and "electronic, mechanical or other device" provided by N.J.S.A. 2A:156A-2(d)(1) and 18 U.S.C. § 2510(5) apply to telephone equipment used by law enforcement officers in the ordinary course of their duties, regardless of whether the monitoring on a particular occasion is random or is done by an officer who regularly performs that duty. In this case, the monitoring was performed in the normal manner, by activating the monitoring *546 equipment in the administrative area of the prison, and the monitoring was done for the same reason as the monitoring of other calls by inmates, that is, to prevent the use of inmate telephones to plan actions which may breach prison security. In our opinion, it would be unreasonable to construe the federal and state acts as requiring court authorization before telephone equipment regularly used to monitor calls on inmate telephones can be activated based on specific information that a telephone will be used for a prohibited purpose.
This conclusion is supported by United States v. Paul, 614 F.2d 115 (6th Cir.1980), which upheld the monitoring of prison calls pursuant to prison policy communicated to prisoners as being within the ordinary course of the correction officers' duties. The court in Paul distinguished Campiti v. Walonis, 453 F. Supp. 819 (D.Mass. 1978), aff'd 611 F.2d 387 (1st Cir.1979) on the grounds that "[t]here, the monitoring was not shown to be related to prison security and was not done pursuant to a posted prison regulation." 614 F.2d at 117. In United States v. Vasta, 649 F. Supp. 974, 989 (S.D.N.Y. 1986), the court expressed doubts whether "Congress intended Title III to apply to prisons" but concluded that in any event an "institutionalized, ongoing policy" of monitoring calls by correction officers would be "in the course of their duties" as "investigative or law enforcement officers." The instant case is similar to Paul and Vasta and readily distinguishable from Campiti. The telephone equipment was installed to conduct regular monitoring in order to detect threats to prison security. Moreover, the only inmates authorized to use the phone were the members of New Directions, and they expressly authorized installation of the monitoring equipment. La Bruno, whose use of the phone was unauthorized, was not entitled to receive separate notice of the monitoring. Therefore, the monitoring of the calls made by La Bruno on the New Directions telephone was consistent with both the federal and state acts governing wiretapping.
Defendant's further contention that the warrantless interception of La Bruno's calls on the New Directions telephone *547 violated the Fourth Amendment is clearly without merit. See Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); United States v. Hearst, 563 F.2d 1331, 1344-1346 (9th Cir.1977), cert. den. 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); United States v. Paul, supra, 614 F.2d at 116.[7]

III
Defendant's claim made in Point XII that he did not receive effective assistance of counsel is clearly without merit. R. 2:11-3(e)(2). However, a brief discussion is appropriate with respect to defendant's allegation that his attorney failed to advise him of a plea bargain offered by the State. The only support in the record for this allegation is the following exchange between the trial judge and defendant during sentencing:
THE COURT: I also find the fact that there was a plea bargain is not particularly significant in this case. I think you are right in some cases, Mr. Ferencz, but I don't think the extended term provision of the Statute is unfairly applied in this case. There are many reasons why a plea bargain is offered. This was a very long, complex, difficult case with three Defendants, and certainly Mr. Fornino had a right to go to trial, but I also think once you go to trial, not that you should be punished for then going to trial, but once you take your shot at it all bets are off.
THE DEFENDANT: Your Honor, that's news to me. I didn't know there was a plea bargain involved here. Nobody ever told me when, where, I never saw it.
THE COURT: I think you better take that up with your lawyer.
THE DEFENDANT: Not only that, if I was guilty I would have ventured to ask about it, but being I wasn't guilty I took the trial.
THE COURT: So, you wouldn't have wanted the plea bargain anyway.
THE DEFENDANT: I don't know, that's not the point, the point is that an innocent man doesn't take a plea bargain.
*548 As far as the record discloses, defendant had not been sworn when he made the foregoing statements. Furthermore, he never made any application to the trial court for relief based upon the alleged failure of his counsel to advise him of the State's offer of a plea bargain. Hence, defense counsel was not called upon to provide his version of his communications with defendant regarding the offer of a plea bargain, and the trial court never made any pertinent findings of fact. Under these circumstances, defendant's claim of ineffective assistance of counsel based on the alleged failure to advise him of an offer of a plea bargain is not properly before us. See State v. Walker, 80 N.J. 187, 194 (1979).
Affirmed.
NOTES
[1] Carmen La Bruno, Sr. is referred to in this opinion as La Bruno, Sr.; Carmen La Bruno, Jr. is referred to as La Bruno.
[2] La Bruno's appeal from the denial of his motion to suppress, the acceptance of his guilty plea, and his sentence, was argued on the same date as this appeal. Our opinion in the appeal by La Bruno is also being filed today.
[*] At the direction of the court, the specification of issues has been edited for publication to set forth only the issues discussed in the opinion.
[3] The Code of Criminal Justice does not include seven examples set forth in the Model Penal Code of conduct "strongly corroborative of the actor's criminal purpose." Except for this omission, N.J.S.A. 2C:5-1(a)(3) and (b) are the same as the Model Penal Code.
[4] Under the Model Criminal Jury Charges, Title 2C, N.J.S.A. 2C:5-1 (Proposed Draft May 11, 1987) the model charge with respect to attempt includes the following:

The law provides that a person is guilty of an attempt to commit a crime if ... the person ...
* * * * * * * *
(3) Purposely did or omitted to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in the course of conduct planned to culminate in (his/her) commission of the crime. However, the step taken must be one which is strongly corroborative of the defendant's criminal purpose. The accused must be shown to have had a firmness of criminal purpose in light of the step(s) the accused has already taken; however, these steps must be substantial and not mere preparation. (Emphasis added).
In light of the Code's treatment of the law of attempt discussed in this opinion, we suggest that the Model Criminal Jury Charges Committee should consider modifying the above charge either by eliminating the statement that "mere preparation" does not constitute an attempt or by incorporating the language of the Penal Code Commentary that "very remote preparatory acts" do not constitute an attempt.
[5] The stenographic notes of the trial judge's original oral opinion delivered on April 9, 1984 were lost before being transcribed. The judge reconstructed that opinion from his notes, which he described as a written "rough draft" which was "read into the record," and redelivered the opinion orally on November 7, 1985.
[6] Section 2510(4) has subsequently been amended by P.L. 99-508, § 101, 100 Stat. 1848. Although this amendment does not appear to change the conclusions reached in this opinion, there is no need for us to pass on the question since the amendment became effective after the operative events involved in this case.
[7] Since we conclude that the monitoring of La Bruno calls on the New Directions telephone was not illegal, we are not required to consider the trial court's finding that the affidavit submitted in support of the wiretap application contained no information gained from monitoring these calls and that the evidence obtained pursuant to the wiretap authorization would therefore be admissible in any event.