UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 95-1582

 WILLIAM LANGTON AND DAVID LEBLANC,

 Plaintiffs - Appellees,

 v.

 WILLIAM HOGAN, JR., ET AL.,

 Defendants - Appellants.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Rya W. Zobel, U.S. District Judge] 

 

 Before

 Boudin, Circuit Judge, 

 Bownes, Senior Circuit Judge, 

 and Keeton,* District Judge. 

 

 Robert J. Munnelly, Jr., Assistant Attorney General, with 
whom Scott Harshbarger, Attorney General of Massachusetts, Karen 
Laufer, Assistant Attorney General, and Philip W. Silva IV were 
on brief for appellants.
 Dennis J. Bannon for appellees. 

 

 November 21, 1995
 

  

* Of the District of Massachusetts, sitting by designation.

 KEETON, District Judge. This is an appeal by KEETON, District Judge. 

Defendants-Appellants from a 1995 Judgment of the district court

modifying, on motion of Defendants-Appellants, but not to the

full extent they requested, a Permanent Injunction ordered in

1984. We treat the 1995 Judgment as in essence a ruling on a

motion for modification of a consent decree that did no more than

decide the issues before the court, as the matter was presented

by Defendants-Appellants. Discerning no error of law, no clearly

erroneous finding of fact, and no abuse of discretion, we affirm.

 I. Background Facts and Procedural History I. Background Facts and Procedural History

 In 1979, the Plaintiffs-Appellees, two inmates of a

Massachusetts correctional institution, filed a civil action

under 42 U.S.C. 1983, claiming, among other things, that

predecessors of Defendants-Appellants in positions of authority

in the institution and the state correctional system had violated

and were continuing to violate constitutionally protected rights

of the inmates by intercepting and monitoring their telephone

calls, including calls to their counsel as well as other private

calls, and that such interception and monitoring violated the

federal and state wiretapping statutes, 18 U.S.C. 2510 et seq. 

and Mass. Gen. L. ch. 272, 99 et seq.  

 For convenience, we will refer to Plaintiffs-Appellees

as plaintiffs or by name, and Defendants-Appellants as defendants

or the Department of Correction.

 In 1984, after negotiations of the parties, and

 -2-

consultations of counsel and the judge to whom the case had been

randomly assigned, the parties entered into a Settlement

Stipulation, dated October 17, 1984, providing for a Permanent

Injunction in the form of an attached exhibit, and a Judgment of

Dismissal in the form of another attached exhibit. The district

court (Zobel, D. J.) approved the settlement and made the two

orders. One was the Judgment of Dismissal, reciting that, in

view of the Settlement Stipulation, 

 all of the claims by both plaintiffs in this
 action are dismissed with prejudice and
 without costs or attorney's fees to any
 party.

App. 000029. 

The other was a Permanent Injunction in view of the Settlement

Stipulation: 

 1. All officers, agents, servants,
 employees and attorneys of the Department of
 Correction are enjoined permanently, under
 both 18 U.S.C. 2510 et seq. and M.G.L. c. 
 272, 99 et seq., from intercepting, 
 endeavoring to intercept or procuring any
 other person to intercept, any wire
 communication by or to William Langton or
 David LeBlanc, inmates within the custody of
 the Department, without a specific court
 order or legislative authorization to do so,
 except as specifically permitted by these
 statutes, taken together, as they have been
 amended or may be amended and as they have
 been construed in reported decisions that are
 binding in this Court or in the state courts
 of Massachusetts.

 2. This Permanent Injunction, entered
 pursuant to the Settlement Stipulation dated
 October 15, 1984, shall operate prospectively
 only. It shall not of its own force affect
 the rights of inmates of the Department other
 than William Langton and David LeBlanc.

 -3-

App. 000030-31.

 The Department of Correction apparently complied with

the Permanent Injunction without incident for almost a decade,

until April 1994, when it promulgated new regulations governing

telephone access and use by inmates, 103 C.M.R. 482.00 et seq. 

(hereinafter "the Regulations"). These Regulations, ostensibly

applicable to all inmates in all Department institutions and

facilities, instituted a system of routine monitoring of inmate

telephone calls by the Department of Correction and required

inmates to sign a form consenting to having their calls

monitored, or be deprived of their telephone access. The

Regulations also limited the number of telephone calls that could

be made by inmates to ten monitored calls to non-lawyers, and

five non-monitored calls to lawyers. All telephone calls,

whether lawyer or non-lawyer, were required to be pre-approved.

 The Department of Correction sought to apply the new

Regulations to plaintiffs. Plaintiffs refused to sign the

consent forms and were denied telephone access. In June 1994,

plaintiffs filed a Petition for Contempt alleging that the

Department of Correction had prohibited plaintiffs from placing

telephone calls unless they agreed to permit the recording of all

their telephone calls. Defendants moved to dismiss the petition

for contempt, and plaintiffs filed an opposition to the motion to

dismiss. 

 While the motion to dismiss was still pending,

defendants filed, in January 1995, a Motion to Modify the

 -4-

Permanent Injunction

 to allow for the restrictions, monitoring and
 recording of plaintiffs' telephone use in
 accordance with the Department of
 Correction's new telephone regulations, 103
 CMR 482.00 et seq. 

App. 000077.

 On February 21, 1995, Judge Zobel signed a Memorandum

of Decision, the last paragraph of which is as follows:

 Defendants' motion to modify the permanent
 injunction is allowed to the extent that the
 Department of Correction may limit
 plaintiffs' access in accordance with the
 Regulations, 403 CMR 482.00 et seq. It is 
 denied to the extent that defendants shall
 not monitor plaintiffs' calls and 482.10
 shall not apply to plaintiffs. Counsel shall
 submit a form of judgment reflecting the
 modification allowed.

App. 000103.

 Counsel having failed to agree upon a form of judgment

reflecting the modification allowed, Judge Zobel, on May 3, 1995,

signed a Judgment as follows:

 After hearing on the defendants' Motion to
 Modify the Permanent injunction, and in
 accordance with the Court's Memorandum of
 Decision dated February 21, 1995, it is
 hereby ordered and adjudged:

 1. The defendants shall not monitor or
 record the telephone calls of the plaintiffs,
 William Langton and David LeBlanc.

 2. The provisions of 403 CMR 482.10,
 shall not apply to the plaintiffs (except for
 call detailing, which shall apply to the
 plaintiffs) pending further order of the
 court upon application of the defendants.

 3. Acceptance by each plaintiff of a PIN
 and use of inmate telephones shall not be
 deemed as consent to the conditions and

 -5-

 restrictions placed upon inmate telephone
 calls, including call monitoring or
 recording.

 4. The defendants shall notify by letter
 each non-attorney whose name appears on the
 plaintiffs' lists of preauthorized telephone
 numbers that the message regarding recording
 and monitoring should be disregarded and that
 calls made by the plaintiffs are not subject
 to monitoring and recording.

 5. The plaintiffs may request changes in
 their preauthorized telephone numbers at any
 time. Such changes shall be made
 expeditiously by the defendants provided they
 are in compliance with the restrictions on
 the total number of personal and attorney
 numbers plaintiffs are allowed to call
 pursuant to 403 CMR 482 et seq. If, at any 
 time, defendants believe plaintiffs are
 abusing this arrangement, they may petition
 the court for further relief.

 6. Defendants' Motion to Modify the
 Permanent Injunction is allowed to the extent
 that the Department of Correction may limit
 plaintiffs' access in accordance with the
 Regulations, 403 CMR 482.00 et seq., as 
 amended, so long as such amendments do not
 change the substance of this order.

 7. Modification of the Permanent
 Injunction entered by this court on
 October 15, 1984 is required for the
 Department of Correction to apply new inmate
 telephone access regulations to the
 plaintiffs.

App. 000104-106.

 II. The 1984 Permanent Injunction and Judgment of Dismissal II. The 1984 Permanent Injunction and Judgment of Dismissal

 The 1984 Permanent Injunction was not in the classic

mold of consent decrees, as two orders were made rather than a

single integrated consent decree. The terms of these two orders,

however, were as surely part of the terms of the settlement as

 -6-

were the recitations in the document entitled Settlement

Stipulation. In this case, we take account of the terms of all

three documents in construing each, and we conclude that they do

not support the interpretation urged upon the district court, and

here, as the primary contention of defendants.

 This is an appeal from the district court's ruling on a

motion for modification, yet defendants have not presented

arguments as to why the 1995 Judgment should be modified, in

light of changes in law or fact, to allow the Regulations to be

applied to the plaintiffs. Defendants instead contend that the

Regulations should be applied to the plaintiffs because the

Regulations do not violate, and never have violated, the 1984

Permanent Injunction. Defendants argue that the federal and

state wiretapping statutes, as they interpret those statutes, do

not prohibit the Regulations, and therefore the Permanent

Injunction does not prohibit the Regulations.

 Rather than argue for modification, defendants, in

essence, argue that the Permanent Injunction did no more than

prohibit them from violating law, that there was never any

adjudication that they had violated any constitutionally

protected right of plaintiffs, that they yielded nothing with

regard to any reasonably disputable issue of law or mixed-legal-

factual issue but merely stipulated that they would not commit

certain types of violations of law in the future, and therefore

that when the district court in 1995 purportedly granted in part

but not fully their motion for modification of the Permanent

 -7-

Injunction, the court was in effect enlarging the injunction in

plaintiffs' favor rather than granting limited modifications in

defendants' favor in order appropriately to tailor relief to

defendants' showing, on the record before the district court at

the time it made its 1995 ruling, of changes in law or fact that

warranted modification of the Permanent Injunction.

 We conclude that the position of Defendants-Appellants

is flawed in several ways, as explained below.

 If the Permanent Injunction did not in any way enlarge

the rights of plaintiffs beyond what they were under defendants'

proposed interpretation of the law, then defendants gave up

nothing in settling the dispute. This is an unlikely

interpretation and we do not accept it. If it were correct, no

purpose would be served by the declaration in paragraph 2 that

the Permanent Injunction "shall not of its own force affect the

rights of inmates of the Department other than William Langton

and David LeBlanc." Defendants' contention, in effect, asks us

to hold that both paragraph 1 and paragraph 2 were illusory --

stating nothing beyond what was already forbidden by law before

the Permanent Injunction was entered. This is not a reasonable

interpretation. 

 The usually understood meaning of a Settlement

Stipulation is that each party is agreeing to give up something -

- to yield on one or more reasonably plausible contentions of

law, or fact, or mixed-law-fact issues. "[T]he agreement reached

normally embodies a compromise; in exchange for the saving of

 -8-

cost and elimination of risk, the parties each give up something

they might have won had they proceeded with the litigation."

United States v. Armour, 402 U.S. 673, at 681 (1971). When 

making an agreement for a consent decree, the parties to a case

are agreeing not to press any of their disputes to decision in

court. The parties forego "their right to litigate issues

involved in the case and thus save themselves the time, expense,

and inevitable risk of litigation." Armour, 402 U.S. at 681. We 

so interpret the Settlement Stipulation of the parties to this

case. The parties' disputes thus settled may include disputes

about applicable law, disputes about facts, and disputes about

mixed-legal-factual issues, including disputes about the

materiality under rules of law (as finally determined in court

proceedings at trial or on appeal) of particular disputes of

fact.

 In the present case, it was clear, before the

Settlement Stipulation, that disputes of fact had been raised by

the pleadings. It might reasonably be argued in support of the

position now advanced by defendants, however, that rather than

settling the merits of these disputes the Settlement Stipulation

rendered them moot. Without so deciding, we assume in

defendants' favor that this is so as to any strictly factual

disputes.

 As to the reasonably disputable issues of law or mixed-

legal-factual disputes, a settlement and consent decree in

accordance with the settlement preclude the parties from

 -9-

reasserting their contrasting legal arguments on such issues

without having first shown cause for vacating or modifying the

consent decree. Whatever the law governing this case might have

been just before the parties entered into the Settlement

Stipulation, the Permanent Injunction was a lawfully entered

order of court. The law as between the parties to the case is

what it was agreed to be in the Permanent Injunction. The

Supreme Court has stated:

 [T]he scope of a consent decree must be
 discerned within its four corners, and not by
 reference to what might satisfy the purposes
 of one of the parties to it .... [T]he
 instrument must be construed as it is
 written, and not as it might have been
 written had the plaintiff [or defendants]
 established his [or their] factual claims and
 legal theories in litigation.

Armour, 402 U.S., at 681-82. Accord, Firefighters Local Union 

No. 1784 v. Stotts, 467 U.S. 561, 574 (1984). The parties are 

not free to argue their contrasting legal theories of the meaning

of the statutes that underlie the Injunction, because they gave

up the right to have that dispute resolved by the court. 

 We take account of the fact that Armour was decided 

long before Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 

(1992), and that Armour's holdings must be read today, especially 

as applied to an institutional consent decree like that before us

now, with sensitivity to any modification of precedent that the

decision in Rufo has effected. As we note in Part IV below, 

however, this point bears principally upon whether modification

of the Permanent Injunction should be made, not upon what the

 -10-

Permanent Injunction meant when entered, or meant in 1994 or

1995, absent modification.

 We take account also of unsettled questions regarding

whether Armour was modified by United States v. ITT Continental 

Baking Co., 420 U.S. 223 (1975). We conclude, however, that even 

if ITT is read as liberalizing to some degree the standard for 

going outside the text of a consent decree to assist in

determining its meaning, defendants have not offered any

persuasive reason for going outside the text of the Permanent

Injunction in this case. Even if we were to assume that

ambiguity of the meaning of the text of the Permanent Injunction

warrants our consideration of extraneous sources of

clarification, defendants' position is not aided. Looking

outside the text of the Permanent Injunction to then existing

law, rather than clarifying defendants' position, muddles it

further, because the existing law was uncertain and yet to be

determined (as explained in Part III below). We see no reason to

permit defendants to argue that genuine disputes regarding what

the state and federal statutes prohibited defendants from doing,

or permitted them to do, should be resolved now in defendants'

favor and thereby control the meaning of the Permanent

Injunction. Instead we hold that the Permanent Injunction (along

with the associated documents) settled those underlying legal

disputes.

 The way in which a consent judgment or consent decree

resolves, between the parties, a dispute over a legal issue is

 -11-

not a ruling on the merits of the legal issue that either (1) 

becomes precedent applicable to any other proceedings under the

law of stare decisis or (2) applies to others under the law of 

claim preclusion or issue preclusion. See Martin v. Wilks, 490 

U.S. 755 (1989)(parties to litigation cannot enter into a consent

judgment that will preclude a person not made a party from

bringing a later suit alleging violation of his or her legal

rights). The resolution of the legal dispute by consent judgment

is nonetheless binding on the parties to the case in which the

consent judgment is entered. The parties to this case are bound

by the rules of law declared in the Permanent Injunction,

although no other parties are so bound.

 We state the point more generally. When a dispute of

law exists between parties to a case and they agree to a

settlement of that dispute and entry of a judgment with prejudice

based on that settlement, then the terms of that judgment in

relation to that legal issue are subject to res judicata

principles. A judgment that is entered with prejudice under the

terms of a settlement, whether by stipulated dismissal, a consent

judgment, or a confession of judgment, is not subject to

collateral attack by a party or a person in privity, and it bars

a second suit on the same claim or cause of action. See 1B 

Moore's Federal Practice .409[5] (2d ed. 1995). Such a judgment 

has the force of res judicata until further order of that or a

higher court modifying that consent judgment. This proposition

is supported in a large body of precedent. See, e.g., In re 

 -12-

Medomak v. Canning, 922 F.2d 895 (1st Cir. 1990) (generally a 

court-approved settlement receives the same res judicata effect

as a litigated judgment); accord, In Re Laing, 31 F.3d 1050 (10th 

Cir. 1994); Keith v. Aldridge, 900 F.2d 736 (4th Cir. 1990), 

cert. denied, 498 U.S. 900 (1990); Epic Metal Corp. v. H.H. 

Robertson Co., 870 F.2d 1574 (Fed. Cir. 1989), cert. denied, 493 

U.S. 855 (1989); Kurzweg v. Marple, 841 F.2d 635 (5th Cir. 1988); 

Amalgamated Sugar Co. v. NL Industries, 825 F.2d 634 (2d Cir. 

1987), cert. denied, 484 U.S. 992 (1987). 

 -13-

 III. Settling Disputable Issues of Law III. Settling Disputable Issues of Law

 Defendants have not called attention to any "specific

court order or legislative authorization" occurring after the

entry of the Permanent Injunction. Defendants' position is not

salvaged by the language in the Permanent Injunction stating that

defendants are enjoined under the state and federal acts from

intercepting telephone calls, 

 except as specifically permitted by these
 statutes, taken together, as they have been
 amended or may be amended and as they have
 been construed in reported decisions that are
 binding in this Court or in the state courts
 of Massachusetts.

The statutes do not "specifically permit" the Regulations, and

the meaning of the statutory provisions for permitted

interception and monitoring, as "amended" or "construed" in

"binding" decisions, is at least reasonably susceptible to a

construction contrary to defendants' proposed interpretation. 

 Defendants contend that the Regulations do not violate

the state or federal wiretapping statutes for three reasons.

Even now, reasonable arguments can be advanced against, as well

as for, each of defendants' contentions about the applicable law.

 First, defendants argue that the Massachusetts Wiretap

Act, Mass. Gen. L. ch. 272, 99 et seq., prohibits only secret 

"interception", and monitoring under the Regulations is not

secret and therefore not prohibited. The 1984 Permanent

Injunction, however, prohibited conduct that would amount to

"interception" under federal law, even if that conduct would not

amount to "interception" under state law. The federal wiretap

 -14-

act, 18 U.S.C. 2510, et seq., does not make secrecy decisive. 

That act, as of 1984, defined the term "intercept" as simply "the

aural acquisition of the contents of any wire, or oral

communication through the use of any electronic, mechanical, or

other device." 18 U.S.C. 2510(4). Monitoring and recording of

plaintiffs' telephone calls under the Regulations thus

constitutes "interception" under the 1984 Permanent Injunction,

despite its being performed openly and without secrecy.

 Second, defendants attempt to argue that the new

Regulations do not violate the 1984 Permanent Injunction because

the definition of "interception" within the federal wiretapping

act, at 18 U.S.C. 2510(5), expressly excludes recording or

monitoring performed "by an investigative or law enforcement

officer in the ordinary course of his duties." Defendants

interpret the statute to mean that monitoring by corrections

officials under the Regulations falls within the excluded

category. The defendants have not shown beyond genuine dispute,

however, that in monitoring conversations corrections officials

would be acting as "investigative or law enforcement officer[s] 

in the ordinary course of [their] duties." Defendants cite 

several cases from other courts that may be read as so holding.

United States v. Sabubu, 891 F.2d 1308, 1328 (7th Cir. 1989); 

United States v. St. Paul, 614 F.2d 115, 117 (6th Cir. 1980); 

State v. Fornino, 539 A.2d 301, 308 (N.J. Super. Ct. App. Div. 

1988). We are, however, aware of no reported decisions to this

effect that are binding in this court or in the state courts of

 -15-

Massachusetts. In Campiti v. Walonis, 611 F.2d 387, 392 (1st 

Cir. 1979), the First Circuit expressly reserved decision as to

whether monitoring in accordance with an established prison

policy of which the prisoners were informed could qualify as part

of the ordinary course of business of a law enforcement officer.

The issue in this circuit was in 1984, and still is, reasonably

debatable.

 Finally, defendants argue the new Regulations do not

violate the 1984 Permanent Injunction because the federal act

under 18 U.S.C. 2511(2)(c) permits monitoring or recording by

"a person acting under color of law" where "one of the parties to

the communication has given prior consent to such interception."

Defendants contend that the Regulations meet the one-party

consent exception of the federal act because inmates impliedly

consent to be monitored when they use the telephone after being

made aware that monitoring of calls is a condition for being

allowed to use the telephone. Defendants have cited cases from

other jurisdictions holding that execution of forms by inmates

that acknowledge their understanding that their calls will be

monitored constitutes consent under the federal act, even if

inmates are denied telephone access if they do not sign the

forms; and that calls placed by inmates despite express notice

from stickers on the telephones and the message from the

automated operator that accompanies every call constitutes

consent. See United States v. Horr, 963 F.2d 1124, 1126 (8th 

Cir. 1992); United States v. Amen, 831 F.2d 373, 378-79 (2d Cir. 

 -16-

1987); United States v. Willoughby, 860 F.2d 15, 20-21 (2d Cir. 

1988); United States v. Paul, 614 F.2d 115, 117 (6th Cir. 1980); 

United States v. Valencia, 711 F. Supp. 608, 611 (S.D.Fla. 1989); 

United States v. Green, 842 F. Supp. 68, 71-71 (W.D.N.Y. 1994). 

Defendants also argue that because the Regulations require

positive call acceptance from the recipient after hearing a

recorded message, recipients are deemed to have impliedly

consented. Defendants, however, cite no cases to this effect.

 Once again, we are aware of no reported decisions that

are binding in this court or in the state courts of

Massachusetts, holding that this type of prison telephone

monitoring system meets the one-party consent exception to the

federal wiretapping act due to implied consent. It may

reasonably be argued that "implied consent" in this sense is not

a free and voluntary consent; it is instead no more than a choice

between unattractive options -- a limited choice imposed on

plaintiffs by defendants. The issue then becomes whether the law

allows the defendants to impose this limitation of choice on the

defendants and call their response an implied consent. At the

least, grounds exist for genuine dispute about whether defendants

are authorized by law to impose such a limited choice on

plaintiffs and whether "implied consent" under these

circumstances is "consent" as that term is used in the federal

act, and legally effective consent under the Department's

regulations. See Griggs-Ryan v. Smith, 904 F.2d 112 (1st Cir. 

1990) (holding that "implied consent" is consent in fact,

 -17-

inferred from associated circumstances indicating that a party

knowingly agreed to surveillance).

 The issue of what constitutes "implied consent" in the

prison context has not yet been directly addressed by this court,

and we do not decide it here. It is sufficient to point out that

plaintiffs in this case have not consented, impliedly or

otherwise, to the monitoring scheme; plaintiffs instead brought a

contempt action under the Permanent Injunction, an opposition to

defendants' motion to dismiss the contempt action, and an

opposition to defendants' motion for modification of the

Permanent Injunction. We do not read Griggs-Ryan as supporting 

the view that an inmate has impliedly consented to the very

scheme the inmate has challenged as a violation of the 1984

Permanent Injunction. 

 Defendants entered into a Settlement Stipulation under

which each party gave up the right to have the dispute as to the

meaning of the federal and state wiretapping statutes resolved by

a court. The meaning of what was permitted under the state and

federal wiretapping statutes was ambiguous and reasonably

debatable. Defendants have no right to have that dispute now

decided in their favor and then to use that resolution to

interpret the terms of the Permanent Injunction.

 Of course, this does not mean defendants are forever

barred from moving that the court orders be vacated or modified.

Special rules are applicable to institutional consent decrees,

but they concern grounds for vacating or modifying a consent

 -18-

decree, rather than undermining the force of this body of

precedent in relation to the effect of the consent decree until

vacated or modified. We perceive no error in Judge Zobel's

invoking for guidance, in her consideration of the defendants'

motion for modification of the 1984 Permanent Injunction in this

case, the body of precedent applicable to motions for

modification of a consent decree. This body of precedent

includes the case on which she relied especially, Rufo v. Inmates 

of Suffolk County Jail, 502 U.S. 367 (1992) (holding that a party 

seeking modification of a consent decree may meet its initial

burden by showing a significant change either in factual

conditions or in law). Under the guidance of Rufo, however, a 

court considering such a motion would be concerned with tailoring

modifications according to intervening changes in law (as well as

fact). It would not be deciding the original dispute about what

would have been a court's answer to the dispute had the parties

not entered into their Settlement Stipulation.

 IV. The Nature of the 1995 Judgment IV. The Nature of the 1995 Judgment

 When these legal principles are applied here, can it

reasonably be said that the 1995 Judgment modified the consent

decree in plaintiffs' favor, as defendants contend, rather than 

only in defendants' favor though less substantially so than they

requested? We conclude that, as properly construed in the way

explained below, the 1995 Judgment modified the Permanent

Injunction only in defendants' favor. It was appropriately

 -19-

tailored to the only changes in law or in fact disclosed on the

record before the district court as developed after ample

opportunity for defendants to present both legal and evidentiary

support for their motion for modification.

 The only changed circumstances shown on the record

before the district court at the time of its 1995 Judgment were

changes of fact with respect to technology of initiating,

detailing, effecting, monitoring, and recording electronic

transmissions, including telephone calls. The only changes of

law shown were those effected when the Department of Correction

adopted new regulations, published in 403 CMR 482.10 et seq. 

Rather than attempting to show that the district court's

modifications, recited in the 1995 Judgment, were not reasonably

tailored to those changes, defendants seek to show that the 1984

Permanent Injunction was not in any respect a settlement of a

disputed issue of law but instead preserved their unlimited right

to assert their view of the law and have that dispute decided now

in their favor.

 Defendants ask us on this appeal to resolve that

original dispute about the law in their favor, and argue that the

district court should have done so instead of conceiving its duty

as one of considering whether intervening changes of law (as well

as fact) had occurred, and, if so, how to tailor modifications of

the consent decree accordingly. We reject this contention.

 The key modification of the 1984 Permanent Injunction

that the 1995 judgment makes is explained:

 -20-

 Modification of the Permanent Injunction
 entered by this court on October 15, 1984 is
 required for the Department of Correction to
 apply new inmate telephone access regulations
 to the plaintiffs.

The 1995 judgment adds, for clarity, a statement of some of the

terms that remain in effect. These terms are not enlargements of

the terms of the Permanent Injunction in plaintiffs' favor; they

simply clarify limits on the scope of the modifications in

defendants' favor.

 The 1995 judgment says nothing, either directly or

impliedly, about how any future motion for modification with

appropriate showing of cause and request for appropriately

tailored relief should be heard and decided under the principles

of Rufo, 502 U.S. 367. Nor do we. Instead, we leave such 

matters for decision in the future only if and when they are

appropriately presented first in district court.

 V. Conclusion V. Conclusion

 For the foregoing reasons Defendants-Appellants'

arguments fail. The 1995 judgment of the district court is

AFFIRMED. 

 -21-

 "Dissent Follows" "Dissent Follows"

 -22-

 BOUDIN, Circuit Judge, dissenting. This case turns BOUDIN, Circuit Judge, dissenting 

centrally on the interpretation of a provision of a 1984 consent

decree settling a case that Langton and LeBlanc brought against

Massachusetts corrections officials. The majority's opinion

contains many unexceptionable statements of law, but on the

pivotal issue--the reading of a sentence of the 1984 decree--the

majority's reading simply does not square with either the

decree's language or its purpose. Indeed, because this case

involves the regulation of a state agency by federal judges under

an elderly consent decree, it raises issues of policy and

judicial attitude that go beyond a mere quarrel about decree

language.

 1. In 1979, Langton and LeBlanc filed a 1983 action

against the state prison authorities complaining of mistreatment.

The complaint alleged that using corrections officers to

distribute medication violated state health laws and the

Constitution; that the number of telephone calls permitted to the

plaintiffs was too few and the time limit too short; and finally

that the prison had been monitoring telephone calls--one call by

Langton to an attorney was specified--and that such monitoring

violated 18 U.S.C. 2510 and Mass. Gen. Laws ch. 272, 99, the

federal and state wire-tapping statutes.

 In an April 1983 decision, the district court

considered the medication and limited-calls issues at some

length, and it concluded that no protected rights had been

violated and ordered summary judgment for the defendants. In a

 -23-

brief discussion of the monitoring issue, the district court said

that "[n]on-consensual monitoring of inmate calls may violate 18

U.S.C. 2510," citing a then-recent decision of this court.

Although the defendants denied any such monitoring, Langton's

affidavit described one incident in which he thought that a

telephone call to his lawyer had been monitored; the court said

that the affidavits, "if just barely," created a factual issue

precluding summary judgment.

 In October 1984 the parties entered a settlement

agreement that dealt with several different grievances. The

proposed remedies included new regulations permitting inmates'

access to telephones for at least 15 minutes per day, furnishing

Langton a three-drawer metal file cabinet and a stereo system in

his cell, and arrangements concerning Langton's use of an

electric typewriter in the prison library. Finally, the parties

agreed to the entry of a permanent injunction whose main

paragraph read as follows:

 All officers, agents, servants,
 employees and attorneys of the Department
 of Correction are enjoined permanently,
 under both 18 U.S.C. 2510 et seq. and 
 M.G.L. c. 272, 99 et seq., from 
 intercepting, endeavoring to intercept,
 or procuring any other person to
 intercept, any wire communication by or
 to William Langton or David LeBlanc,
 inmates within the custody of the
 Department, without a specific court
 order or legislative authorization to do
 so, except as specifically permitted by
 these statutes, taken together, as they
 have been amended or may be amended and
 as they have been construed or may be
 construed in reported decisions that are
 binding in this Court or in the state

 -24-

 courts of Massachusetts.

 There has been no showing that this provision aimed to

resolve any dispute between the parties as to what was or was not

unlawful. Indeed, the settlement agreement said, in the

paragraph proposing the injunction just quoted, that corrections

officers "specifically deny that any of them, or anyone acting in

concert with any of them, ever intercepted or monitored any of

Langton's or David LeBlanc's wire communications by any means,

lawful or unlawful . . . ." In short, the parties disagreed

about whether monitoring had occurred, and the matter was settled

by a forward-looking decree that enjoined obedience to two cited

statutes.

 In recent years, prisons have encountered a growing

number of problems created by inmate telephone calls.1 These

problems include the use of telephones to obtain narcotics in

prisons, to promote illegal drug trading outside of prison as

well as other criminal operations, commit fraud in the purchase

of merchandise and goods for prisoners, and to carry out

obstructions of justice and escape plots. Ultimately

Massachusetts followed a number of other prison systems including

the federal prison system in adopting a standardized regime to

control and track inmate use of the telephone system.

 The new Massachusetts regime allows each inmate to list

  

1 This intervening history is recounted in defense affidavits
filed in the district court incident to the latest round of
litigation and the description was largely accepted by the
district court.

 -25-

up to ten family members and friends and up to five private

attorneys or law firms, in addition to three automatically

authorized legal service organizations. Each inmate can place a

call only by using his or her personal identification number, and

the technology restricts the call to one of the 18 telephone

numbers authorized for that inmate. To obtain such a PIN number,

the inmate completes a form that requires the inmate's consent to

various conditions, including call monitoring, call recording and

the retention of various "details" incident to the call (e.g., 

the time of the call, the number called). But calls to

attorneys, law firms and the legal service organizations are not 

subject to monitoring or recording.

 Langton and LeBlanc refused to complete the consent

forms, were denied telephone access, and in June 1994 began the

contempt proceeding that prompted the present appeal. When the

defendants moved to dismiss the petition on the ground that they

had not violated the consent decree, the district judge indicated

that a motion to modify the decree should be filed. Without

agreeing that it was necessary, the defendants filed the

suggested motion. Their affidavits provide reasons why they

think it impractical or dangerous to except Langton and LeBlanc

from the regime that is now applied to all other prisoners.

 In February 1995, the district judge entered an

unpublished decision which treated the issue before the court as

a motion for modification of the consent decree. Fed. R. Civ. P.

60(b)(5), (6). The court granted the government's motion in part

 -26-

and denied it in part, ruling that the new regime did respond to

new technology and real threats of abuse, that Langton and

LeBlanc could be limited as to the number of telephone calls they

could make, but that there was no pattern of abuse by either of

them to justify the monitoring of their calls. The core of the

court's injunctive judgment is that prison officials cannot

monitor or record calls made by these two plaintiffs.

 2. The broad question on appeal is whether the

monitoring and recordation regime violates the consent decree.

The district court evidently assumed that it did--thus its

suggestion that the government file a motion for modification--

but it never addressed this issue in detail. Yet if the regime

does not violate the consent decree, the contempt proceeding case

should have been dismissed and the Rule 60(b) motion mooted.

Langton and LeBlanc have never moved to modify the decree to

enlarge their rights; and prison officials, in moving to modify

the decree in their favor (in accordance with the district

court's suggestion), certainly were not abandoning their bedrock

position that the new regime was lawful under the decree and did

not require any decree modification.

 In my view, a realistic reading of the 1984 decree

provision is that it effectively enjoined state prison officials

from violating the cited provisions of federal or state law and 

nothing more. True the provision was clumsily worded: it 

juxtaposed a ban on interception, itself a term differently

defined under the two cited statutes, with an awkward but broadly

 -27-

worded qualification, namely, that interceptions are allowed "as

specifically permitted by the statutes, taken together, as they

may have been amended or may be amended and as they have been

construed or may be construed in reported decisions that are

binding in this Court or the state courts of Massachusetts."

 The injunction could and probably should have used a

much simpler formulation, such as a ban on "unlawful"

interceptions, but everyone knows that lawyers often overwrite

legal documents. There is no indication anywhere that the phrase

"specifically permitted" means anything more than "permitted,"

the term "specifically" being the kind of legal flourish that

usually causes more trouble than it solves. In any event, the

provision itself describes the defendants as "enjoined . . .

under both 18 U.S.C. 2510 et seq. and M.G.L. c. 272, 99 et 

seq." and nothing in the provision suggests that the injunction 

was intended to be broader than the statutes themselves.

 This view is confirmed by the "circumstances

surrounding the formation of the consent order" which are

properly considered in its interpretation. United States v. ITT 

Continental Baking Co., 420 U.S. 223, 238 (1975). The casus 

belli, it must be remembered, was a claim, denied by prison 

officials, that they had monitored an inmate's call to his

lawyer, something that no one would expect a court or legislature

to authorize. The prison officials, who never contended that

such a monitoring of calls to lawyers would be lawful, simply

denied that they did any monitoring. The parties then settled

 -28-

the case by having the defendants enjoined to obey federal and

state law on interception, as it might be construed by courts or

amended by legislatures from time to time.

 The panel majority expresses disbelief that plaintiffs

in a lawsuit would ever settle merely for a promise by defendants

to obey the law. But in fact such provisions are common in

decrees (SEC consent decrees are a classic example) and, in any

event, a promise simply to obey the law made perfectly good sense

in this case. The settlement provided Langton and LeBlanc a

small number of specific benefits already described. As to

telephone monitoring, the prison did not defend listening in on a

telephone call between an inmate and his lawyer, but denied that

monitoring had occurred or was routinely practiced. Langton and

LeBlanc then settled for a general provision that made the prison

officials subject to contempt proceedings if they did violate the

law in the future.

 If the decree is read in this fashion, then the

contempt motion boils down to the question whether the prison's

new regime is lawful under the relevant statutes. Nothing in the

decree's terms prohibits monitoring or recording as such. The

decree uses the term "interception" which is a statutory concept

freighted with exceptions, and the decree's ban is itself subject

to the broad "except as" clause already described. Nor does the

panel majority hold that the present regime is unlawful under the 

federal and state statutes but only that reasonable arguments can

be made on both sides.

 -29-

 The issue of the regime's lawfulness under the statutes

may be debatable, but it is doubtful that it is a close call.

Massachusetts has adopted a widely used model, used by the

federal prison system as well, see generally 28 C.F.R. 540.100 

et seq., and practically all the case law cited in the briefs 

tends to support it.2 Given the general wording of the federal

and state statutes, and the strong policy considerations for

giving prison officials "appropriate deference and flexibility,"

Sandin v. Conner, 115 S. Ct. 2293, 2299 (1995), it is very 

unlikely that a regime like that of Massachusetts would be struck

down, even if there are possible occasional applications that

might raise hard questions.

 In any event, once it is understood that the decree

only precludes unlawful interception, the district court has 

provided no basis for entering a judgment against the prison

officials since that court did not find that the regime violated

federal or state law. It is true that this general question is

one of law that we might in theory resolve ourselves; but no such

theory has been adequately briefed by the plaintiffs, and no

decision of a district court on this issue has ever been

rendered. The proper solution in this case is to vacate the
  

2 E.g., United States v. Horr, 963 F.2d 1124, 1126 (8th Cir. 
1992); United States v. Sababu, 891 F.2d 1308, 1326-30 (7th Cir. 
1989); United States v. Willoughby, 860 F.2d 15, 19-21 (2d Cir. 
1988); Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988); 
United States v. Amen, 831 F.2d 373, 378-80 (2d Cir. 1987); 
United States v. Paul, 614 F.2d 115, 117 (6th Cir. 1980); United 
States v. Green, 842 F. Supp. 68, 71-72 (W.D.N.Y. 1994); United 
States v. Valencia, 211 F. Supp. 608, 611 (S.D. Fla. 1989); Lee 
v. Carlson, 645 F. Supp. 1430, 1438-39 (S.D.N.Y. 1986). 

 -30-

district court's 1995 judgment and remand to give the plaintiffs

the opportunity to show that the present regime is unlawful, and

therefore in violation of the decree. 

 The panel majority's contrary construction of the

decree does not rest on an attempt to grapple seriously with its

language and background. Rather, the majority relies primarily

on several rather general propositions: that parties sometimes

do resolve by consent decree legal issues that are reasonably

debatable, that such resolutions have an operative effect through

the consent decree, and that parties are bound by the decree even

if the legal issues should have been decided the other way.

These notions might have some bearing if the prison officials had

agreed, with no exceptions, that "monitoring and recordation" are

prohibited. But the defendants did not make such a bargain, so

the general propositions relied on by the majority have nothing

to do with this case.

 To sum up, the panel majority could decide on the

merits whether the new Massachusetts regime does violate the

federal or state statutes, and it would be equally permissible,

and in my view more appropriate, to vacate the 1995 judgment, to

remand and to allow the district court to consider this set of

issues in the first instance. But what is not tenable is an

interpretation of the 1984 consent decree, without serious

support in either its phrasing or its context, that enjoins

Massachusetts officials from doing what (so far as we know from

the precedents) they lawfully can do under existing federal and

 -31-

state law.

 Courts have been widely criticized in recent years for

excessively interfering with state institutions such as prisons

and, of course, these charges are often made by those who are

unaware of the abusive conditions that the federal decrees are

invoked to remedy. But it does behoove federal judges--who do

not have political responsibility for managing these

institutions--to consider with care and modesty how they

interpret their authority, especially in construing elderly

decrees as applied to entirely new sets of conditions.

 -32-