# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0215-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

QUASHAWN K. JONES,

    Defendant-Appellant.

_____

Submitted January 11, 2018 – Decided September 10, 2018

Before Judges Haas, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 14-11-3279.

Joseph E. Krakora, Public Defender, attorney for appellant (Rochelle Watson, Assistant Deputy Public Defender, of counsel and on the briefs).

Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (Melinda A. Harrigan, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a five-day jury trial, defendant Quashawn Jones was convicted of two counts of first-degree attempted murder, N.J.S.A. 2C:5-1, 2C:11-3(a)(1) and/or (2) (counts one and nine);[1] second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six); third-degree witness tampering, N.J.S.A. 2C:28-5(a) (count seven);[2] and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7 (count ten).[3] Defendant was sentenced to an aggregate term of sixty-five years' imprisonment, fifty of which were subject to the eighty-five percent parole ineligibility period under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

---

[1] For trial purposes, counts five through ten of the indictment were renumbered as counts four through nine after count four was dismissed pre-trial on the State's motion. Before the case was submitted to the jury, the trial judge granted defendant's motion for a judgment of acquittal, R. 3:18-1, on count eight renumbered as count seven, charging first-degree witness tampering, N.J.S.A. 2C:28-5(a), and renumbered count nine, charging attempted murder, as count seven.

[2] Defendant was indicted for first-degree witness tampering, but the jury convicted him of the lesser-included offense of third-degree witness tampering.

[3] Following the jury trial, the trial judge found defendant guilty of the certain persons charge in a bifurcated bench trial.

A-0215-15T2

The convictions stemmed from defendant shooting the victim, A.A., three times, in an attempt to kill her. Defendant shot A.A. because he feared that A.A. and her two female friends who witnessed the events leading up to the shootings were setting him up to be robbed or killed. Of the three women, only A.A. testified at trial. In addition, recorded phone conversations were played for the jury, during which defendant discussed, among other things, killing A.A. to prevent her from testifying, the State's evidence against him, and his defenses. Although A.A. was the named victim in both attempted murder charges, count one pertained to the shootings while count nine was predicated upon defendant's comments in those phone conversations.

Defendant now appeals from his convictions and sentence, raising the following arguments for our consideration:

> POINT I
>
> PHONE CALLS IN WHICH DEFENDANT DISCUSSED THE STATE'S EVIDENCE AGAINST HIM, POSSIBLE DEFENSES, AND THE APPLICABLE SENTENCING RANGES SHOULD HAVE BEEN EXCLUDED UNDER N.J.R.E. 403. COMPOUNDING THE PREJUDICE OF THIS ERROR, THE PROSECUTOR ARGUED THAT DEFENDANT WAS "HEDGING HIS BETS" WITH THE TWO AFFIRMATIVE DEFENSES PRESENTED AT TRIAL. (NOT RAISED BELOW).

A-0215-15T2

POINT II

RELYING SOLELY ON PHONE CALLS IN WHICH DEFENDANT EXPRESSED A STRONG DESIRE FOR THE VICTIM'S DEATH, THE STATE FAILED TO ESTABLISH THAT DEFENDANT TOOK A SUBSTANTIAL STEP TO FURTHER HIS ALLEGED CRIMINAL PURPOSE. THEREFORE, THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE SECOND ATTEMPTED MURDER CONVICTION.

POINT III

A REMAND FOR RESENTENCING IS WARRANTED BECAUSE IN IMPOSING AN AGGREGATE TERM OF SIXTY-FIVE YEARS' IMPRISONMENT, THE TRIAL COURT EMPHASIZED THE NEED TO SEND A MESSAGE TO THE ATLANTIC CITY COMMUNITY AND IMPUGNED DEFENDANT FOR INVESTIGATING AN INSANITY DEFENSE AND REJECTING THE STATE'S PLEA DEAL.

After considering the arguments presented in light of the record and applicable law, we reject defendant's argument in Point I, but agree with defendant's argument in Point II that the trial court should have granted his motion for a judgment of acquittal on the second attempted murder charge because the State failed to establish a substantial step. Accordingly, we affirm in part, reverse count nine only, and remand for re-sentencing based upon our reversal.

4

I.

We recite the facts pertinent to the issues raised on appeal gleaned from the trial record. During the early morning hours of November 18, 2013, A.A. and her two friends, M.C. and U.J., were "hanging out" with defendant, whom A.A. had known since childhood, at M.C.'s apartment on North South Carolina Avenue in Atlantic City. A.A. observed defendant "[p]acing back and forth," in the kitchen and "checking out the window" while U.J., who was also in the kitchen, "[l]ook[ed] out the window." According to A.A., defendant was sweating profusely, appeared angry and agitated, and asked U.J. why she was looking out the window, but her response that she was waiting for her boyfriend to arrive did not seem to appease him. Shortly thereafter, defendant accused the women of "lining him up"[4] and told M.C. that "he was going to kill her friend[,]" referring to A.A.

When defendant pulled a gun out of his waistband, A.A. knew that he was serious and fled to the bathroom, intending to escape through the bathroom window. However, she decided instead to try to assuage defendant's fears by showing him her phone to prove that she had not contacted anyone to "set something up." After A.A. came out of the bathroom to show defendant her phone, a struggle ensued during

---

[4]  A.A. explained that "lining him up" meant that the women were setting defendant up to be robbed or killed.

A-0215-15T2

which defendant grabbed A.A. While they "fumbl[ed] around the kitchen," M.C. tried to restrain defendant but the altercation escalated and all three ended up on the floor. As the struggle continued, U.J. ran out of the apartment and M.C. managed to flee from the kitchen, leaving A.A. alone on the floor fighting defendant.

During the fight, A.A. heard a gunshot but was unsure at the time whether the gun discharged on its own or defendant shot her. After defendant was able to extricate himself from A.A., he placed his foot on her chest and shot her in the neck. While A.A. pretended to be dead, she observed defendant open the kitchen window, fire a shot out the window and yell, "[H]elp, I'm hit, I'm hit." At that point, M.C. yelled out to defendant that if he put the gun down, she would return to the kitchen. Defendant responded, "[If you come in the kitchen, I'm going to kill this bitch." Defendant then shot A.A. a second time in the neck, fired a shot out the kitchen window a second time, and shot A.A. one more time before he "jumped out of [the kitchen] window" of M.C.'s second floor apartment.

Thereafter, A.A. managed to go to the apartment across from M.C.'s to summon help, and was transported by ambulance to the hospital where she underwent emergency surgery for life threatening injuries. A.A. suffered "multiple gunshot wounds about the face and the neck, . . . the right arm and the right [axillary] armpit region." She "had acute blood loss anemia," a collapsed right lung, a

fractured clavicle and humerus, and "multiple . . . abrasions and lacerations around the chin on both sides." She was intubated to prevent her airway from collapsing.

Meanwhile, at approximately 6:27 a.m. the same morning, M.C. approached Atlantic City Police Officer Sumon Majunder, who was responding to the scene of the shooting, and told him that "she believed" her girlfriend was shot in her apartment by "a male [by the] name of Shawn a/k/a Neff"[5] after "they got into an argument." According to Majunder, M.C. was "crying," "very nervous," "excited" and "talking . . . fast." At approximately 6:23 a.m., Atlantic City Police Officer Richard Johnson was also responding to the scene when he encountered a man "trying to flag down a car" on Route 30, about a block away from the shooting. When Johnson "hollered to him . . . [to] get out of the street," the man, who was later identified as defendant, responded, "[T]hey're trying to kill me."

After giving Johnson a false name, defendant explained that while walking with a woman on South Carolina Avenue, "[a] green van pull[ed] up," and "a guy jump[ed] out of the van and start[ed] shooting at him." Defendant told Johnson he did not know where the woman, whom he identified by A.A.'s nickname, went but he (defendant) "ran here" where he encountered Johnson. Defendant had blood on

---

[5] Defendant was known by the names "Nef" and "Shawny."

his mouth, but no other visible injuries. At defendant's request, he was taken to the hospital by ambulance for treatment.

As a result of the investigation into A.A.'s shooting, defendant was later arrested. Police recovered three shell casings inside M.C.'s apartment[6] and one outside below the kitchen window adjacent to a bootprint. All four shell casings were .40 caliber and all were fired from the same gun. Police also recovered a magazine from a Smith and Wesson semiautomatic .40 caliber handgun in the gutter along Route 30. However, no weapon was ever recovered.

At trial, A.A. recounted various contacts with defendant and his representatives after the shooting. A.A. testified that in September 2014, while she was speaking on the telephone to a friend she was visiting at the Atlantic County Justice Facility, defendant "took the phone" and "told [her] that [she] was the only way that he could get out of jail," and she "needed to make this go away." Defendant told A.A. "that if there was anything that he [could] do as far as money, minutes or

---

[6] Inside M.C.'s apartment, police also found marijuana packaged for distribution, oxycodone pills and drug paraphernalia. Although A.A. testified that she had stayed at M.C.'s apartment for three days prior to the shooting and observed a number of people making short visits to the apartment, she denied any knowledge of M.C.'s drug dealing activities.

whatever, . . . he would do it for [her]." Following this conversation, A.A. contacted the Prosecutor's Office and relayed the details of defendant's offer.

A.A. further testified that a man approached her on the street and told her that defendant "needed [her] to take [her] statement back because he needed to get home to finish [her] off and to handle [her] brother." In addition, a woman told her "not to come to court." On September 10, 2014, A.A. received a phone call from an unfamiliar phone number. While on the call, A.A. heard defendant's voice and ended the call. Shortly thereafter, A.A. received text messages from the same phone number stating: "that was Nef. He just didn't want to say it over the phone" and "Nef just wanted to talk to you." After receiving these messages, A.A. again contacted the Prosecutor's Office. At the request of Atlantic County Prosecutor's Office Detective Caroline MacDonald, A.A. engaged in a consensual phone conversation with defendant at M.C.'s apartment, which was recorded by MacDonald and played in its entirety at trial.

In the conversation, defendant explained that he had no intent to harm A.A. and asserted that he had alerted police to her injuries. Defendant also explained the reason for his suspicion of the women that morning[7] and detailed the discovery he

---

[7] Defendant explained that he had been the intended victim of a shooting at M.C.'s apartment building a couple days earlier.

received from the State, as well as his desire to help A.A. with "whatever [she] need[ed]." Defendant also disputed A.A.'s statement that the gun went off while the two were fighting on the kitchen floor and alleged that it went off during the initial "tussle." Defendant stated, "You know you came in, you did what you did, I got turned around and I grabbed you, the joint[8] was already out. Somebody grabbed me and . . . [t]hat thing went off."

At trial, the State also introduced excerpts from other phone conversations recorded while defendant was confined at the Atlantic County Justice Facility from February 8 to April 28, 2014, involving numbers associated with defendant. In these conversations, defendant discussed with his girlfriend and his cousin: (1) the events of November 18, 2013; (2) the State's discovery; (3) possible defenses; (4) whether to post bail; (5) inconsistent witness statements; (6) witness recantations; and (6) defendant's frustration that certain persons were "still walkin [sic] around."

At the close of the State's case, the court granted defendant's motion for a judgment of acquittal on count eight, charging witness tampering of M.C.,[9] but

---

[8]  According to A.A., "joint" referred to the gun.

[9]  The court conducted hearings outside the presence of the jury to ascertain M.C.'s availability to testify. Ultimately, M.C. invoked her Fifth Amendment right and did not testify at the trial.

denied defendant's motion for a judgment of acquittal on count nine, the second attempted murder charge. Following the verdict, on July 31, 2015, the court denied defendant's motion for a judgment notwithstanding the verdict on count nine, R. 3:18-2, and denied defendant's motion for a new trial. R. 3:20-1. On the same date, the court granted the State's motion for a discretionary extended term sentence, pursuant to N.J.S.A. 2C:44-3, and, after mergers, sentenced defendant to an extended term of thirty-five years' imprisonment, subject to NERA, on count one, the first attempted murder charge. On count seven, the witness tampering charge, the court sentenced defendant to five years imprisonment, consecutive to count one. On count nine, the second attempted murder charge, the court sentenced defendant to fifteen years imprisonment, subject to NERA, consecutive to count seven. On count ten, the certain person charge, the court sentenced defendant to ten years imprisonment, with a five-year period of parole ineligibility, consecutive to count nine.[10] This appeal followed.

## II.

In Point I, defendant argues that the court erred in admitting the telephone conversations recorded at the Atlantic County Justice Facility. Defendant asserts that the calls "were not relevant under N.J.R.E. 401, to prove or disprove any fact of

---

[10] The remaining counts were merged into count one.

consequence" and "were unduly prejudicial under N.J.R.E. 403." Defendant asserts "[t]he inflammatory nature of the phone calls would lead a juror to believe that defendant was manipulating the legal system and trying to evade responsibility by trying out various spurious defenses" and "hindered the jury's ability to judge impartially [defendant's] self-defense and attempted passion/provocation manslaughter defenses."

Because defendant's contentions in Point I are raised for the first time on appeal, we review them under the plain error standard. R. 2:10-2. Plain error is an "error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 576-77 (1999) (quoting State v. Irving, 114 N.J. 427, 444 (1989)). A reversal based on plain error requires us to find that the error likely led to an unjust result that is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Applying that standard, we find no plain error here.

N.J.R.E. 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the

action."  "Courts consider evidence to be probative when it has a tendency 'to establish the proposition that it is offered to prove.'" State v. Burr, 195 N.J. 119, 127 (2008) (quoting State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)).  The evidence must be probative of a fact that is "really in issue in the case," as determined by reference to the applicable substantive law.  State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)).

Under N.J.R.E. 401, "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar."  Buckley, 216 N.J. at 261.  Moreover, "[t]he proponent need not demonstrate that the evidence can, in and of itself, establish or disprove a fact of consequence in order to meet the benchmark of N.J.R.E. 401."  State v. Cole, 229 N.J. 430, 448 (2017).  "Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is warranted under a specific evidence rule."  Burr, 195 N.J. at 127; see N.J.R.E. 402.

One such exclusionary rule is N.J.R.E. 403.  N.J.R.E 403 mandates the exclusion of evidence that is otherwise admissible "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of

cumulative evidence." Here, defendant relies on the "undue prejudice" factor in N.J.R.E. 403.

The inquiry under that provision "is whether the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues." Cole, 229 N.J. at 448 (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). "It is not enough for the opposing party to show that the evidence could be prejudicial; '[d]amaging evidence usually is very prejudicial but the question here is whether the risk of undue prejudice was too high.'" Ibid. (alteration in original) (emphasis omitted) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)). Indeed, "[t]he mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Swint, 328 N.J. Super. 236, 253 (App. Div. 2000).

The first phone call with which defendant takes issue was a conversation with his girlfriend, in which he discussed bail, a possible insanity-based defense, and potential problems with A.A.'s anticipated trial testimony:

> [DEFENDANT]: So what do you think? So . . . what
> your tellin me is like just sit in here and wait till this
> plays out or like bail out and

[GIRLFRIEND]: Oh no I would bail out, I would not sit in there, I would bail out I mean hopefully, . . . you beat it but what if you don't?

[DEFENDANT]: It wouldn't be no reason I wouldn't beat it.

[GIRLFRIEND]: Then you gonna be stuck

[DEFENDANT]: Nah I mean even if I was to go to trial . . . on this shit, . . . she still got to get up there and she will have to give them a reason why that shit happened you feel what I'm saying and if they still running off this.

. . . .

I was on drugs type shit that ain't, that's like pleain for insanity type shit they can't give me no time for that you feel me?

. . . .

They can't give me no time for that so I'll beat it like that or she got to come up with a story that would say you been around this [n-word] for almost a year and some change[,] he never did this what would make him do it this time you feel what I'm saying they got to paint that picture and she can't give no reasonable explanation of why I would do something like that.

In another phone call with his girlfriend, defendant discussed his intention to go to trial, the weaknesses in the State's proofs and possible sentences:

[DEFENDANT]: Hell yeah I'm goin to trial, you damn right I'm goin to trial . . . , I'm goin to trial because at the end of the day . . .

15

[GIRLFRIEND]: Well, with attempted murder charges they gonna be . . . offerin you a lot from the beginning even if you don't go to trial right?

[DEFENDANT]: (Inaudible) [fifteen], startin but . . . when I go to trial they have to find me guilty of the attempted murder like it has to be attempted murder or they gotta find me guilty of a lesser charge and that lesser charge would be aggravated assault the charge they . . . throwin out, you feel me.

. . . .

The aggravated assault . . . it'll range from five to ten years but the shit is a reckless aggravated assault . . . so that shits anywhere from three to five years, so I'll go to trial and I lose the most I can get is fifteen, you feel me but they gonna have to . . . prove all that shit, they need a weapon, they need everything they don't have none of that shit you feel me like all that shit that them bitches they said got conflicted stories already like . . .

In the final conversation at issue, defendant reiterated his belief that the State's evidence against him on the attempted murder charge was weak and discussed an attempted passion/provocation manslaughter related defense as well as his surprise at learning that A.A. made a statement.

[DEFENDANT]: They gotta paint a picture and the bitches statements was that from what I'm hearin that the statements was that I, I was high I, I went crazy, I tripped out so that attempted murder shit is not gonna rock out anyway, you feel me? That's like a crime in that ah, in the heat of passion type crime, if I was to kill somebody if I came in the house and caught you with

16

another [n-word] and killed him I'd only do five years behind that cause it's in the heat of passion you feel me? I did it on some emotional type shit so now they sayin I did the shit while I was high and on drugs and all this . . . cool keep on runnin with that keep on saying that shit ya'll ain't doin nothin but helpin me out and at the end of the day they gonna ask you well how long you been around this person, how long you been chillin with him, how long have you known him[,] bitches been knowin me forever never did no  . . . shit like this that they saying I did and if they do say I did somethin like that before[,] they gonna ask em why did ya'll continue to hang around this man if he was actin like this like[,] it's a whole bunch of shit that's wit this case man, like it's just some fuck shit bitches did some fuck shit.  You feel me, like all that bitches have a change of heart shit that's why I said man I didn't know that bitch made no statement, I knew she was went to the hospital that bitch didn't make no statement she went right in surgery that bitch was right next to me.  I got my stitches they was stitchin her up or doin whatever they was doin to her. That was it.

Defendant argues that the issue before the jury was whether he "acted in self-defense" and "was justified in using deadly force against [A.A.] for his self-protection" or "whether he attempted to cause her death while in the heat of passion arising from reasonable provocation."  According to defendant, his "characterization of the State's evidence and its application to various defenses was not relevant to the resolution of these issues."  The State counters that the evidence was relevant to establish "defendant's motive and state of mind" in connection with the witness tampering and related attempted murder charge.  According to the State, the

17

evidence "show[ed] why he wanted [A.A.] dead." The State also points out that the evidence was necessary to contradict "defendant's theory at trial . . . that this was an imperfect self-defense – attempted passion provocation."

In support, the State highlights other call excerpts during which "defendant's initial mindset that [A.A.] did not give a statement and was not going to testify" changed when he discovered that A.A. "not only gave a statement to police, but also showed up in court . . . ready to testify against him." According to the State, these conversations demonstrated how defendant's initial confidence that he would prevail at trial was undermined by the knowledge that his aggravated assault charge was being upgraded to attempted murder and ultimately caused him to "question[] . . . why [A.A.] was not dead." Specifically, the State points to the following exchange:

> [DEFENDANT]: [Y]a'll talk to that bail bondsman?
> Ya'll gotta bust that thing ASAP.
>
> [GIRLFRIEND]: I don't know what's up with her I
> haven't talked to her you still ain't talk to her?
>
> [DEFENDANT]: Hell no I went to court today man that
> bitch was in court like what's going on?
>
> [GIRLFRIEND]: Who, the girl was in court?
>
> [DEFENDANT]: Her and her brother.
>
> [GIRLFRIEND]: Her and her brother was in court?

18

[DEFENDANT]: Man they threw my aggravated assault shit out they indictin me on attempted murder now.

[GIRLFRIEND]: Oh my God.

[DEFENDANT]: On everything.

. . . .

[GIRLFRIEND]: You indicted or they gettin ready to indict you?

[DEFENDANT]: (Inaudible) I was supposed to go back today for the pre-indictment on the aggravated assault to get my discovery for that but when I got in there the lawyer . . .

[GIRLFRIEND]: So that means she's gonna testify in court then.

[DEFENDANT]: That's what I'm sayin, that's when she came out, that's when she came out there cause the bitch . . . the prosecutor stood up and she said some shit to me that when she addressed the court and she said some shit to the court that only people in that house would know, you feel what I'm saying?

[GIRLFRIEND]: Um hmm.

[DEFENDANT]: So I'm just like damn this is why they not indictin me on the aggravated assault now they indictin me on attempted murder they said cause . . . the bitch got shot while she was on the ground, I shot her while she was on the ground and some shit like that. But only people that would know anything like that was if you was in that crib, if you was on the scene of that

shit happenin and shit like so they didn't indict me, . . . they didn't even give me discovery on the case they said they not indictin on that, they indictin me on attempted murder so they sendin my shit back [to] grand jury and it take like 60-90 days cause the shit gotta go through the grand jury all over again and see how they gonna work the shit.

. . . .

Yo ask her why the fuck she say everybody's recantin, ain't nobody comin to court, tell her that bitch was in court today wit her fucking brother.

Evidence may be excluded under N.J.R.E. 403 where the evidence pertains to subordinate issues, that is, issues not addressing defendant's guilt or innocence. See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. (2018). However, "[a]t criminal trials, 'courts generally admit a wider range of evidence when the motive or intent of the accused is material.'" State v. Koskovich, 168 N.J. 448, 483 (2001) (quoting State v. Covell, 157 N.J. 554, 565 (1999)). Here, we are satisfied that the admission of the recorded conversations does not constitute plain error. While the evidence was undoubtedly damaging, "the danger of undue prejudice" did not "outweigh probative value so as to divert jurors 'from a reasonable and fair evaluation of the basic issue of guilt or innocence.'" State v. Moore, 122 N.J. 420, 467 (1991) (quoting State v. Sanchez, 224 N.J. Super. 231, 249-50 (App. Div. 1988)).

Furthermore, the court correctly provided a limiting instruction for the portions of the recordings relating to sentencing and plea bargaining, both after the calls were played and again at the end of the case prior to jury deliberations. See Shannon v. U.S., 512 U.S. 573, 579 (1994) (reiterating the principle that the jury "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"); State v. Conforti, 53 N.J. 239, 244-45 (1969) (noting that in making its determination, "the jury should not be influenced by a consideration of what will be the result of its verdict, nor should its attention be distracted from its chief function").

The court instructed the jurors to "totally disregard" any mention of plea bargains and sentences because it was "not relevant to anything that has to do with this case," it was "beyond [their] function . . . as the jury," and "it should not in any way enter in[]to [their] deliberations for any purpose." The court reminded the jurors that they were "here to determine whether the defendant [was] guilty or not guilty of the charges and that [was] all." The court told the jurors they were "not to give any regard to any punishment upon any conviction, if there should be a conviction[,] and the State prove[d] any of the charges beyond a reasonable doubt." "We presume the jury followed the court's instructions." State v. Smith, 212 N.J. 365, 409 (2012).

21

Defendant argues further that, despite the court's instruction to the jury to disregard any discussions in the calls about sentencing ranges or plea bargains, the "inadmissible phone calls laid the foundation for the prosecutor's improper argument in summation," suggesting that "both defenses [were] farcical." According to defendant, the prejudicial nature of the prosecutor's comments took the focus away from the "central issue at trial," namely, "what transpired during the shooting in [M.C.'s] apartment," and placed it on defendant's "haught[y] express[ions] . . . that certain defenses could work in his favor based on the [S]tate's witnesses' statements."

"Because [defendant] failed to object at trial, we review the challenged comments for plain error." State v. Pressley, 232 N.J. 587, 593 (2018). "[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial . . . .'" Id. at 593-94. Thus, "[d]efendant's lack of objections . . . weighs against defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (alterations in original) (quoting Macon, 57 N.J. at 333). Here, we are convinced that defendant has not shown that any error was "'clearly and unmistakably improper' and 'so egregious' that it deprived [him] of the 'right to

22

have a jury fairly evaluate the merits of his defense.'" Pressley, 232 N.J. at 593-94

(quoting State v. Wakefield, 190 N.J. 397, 437-38 (2007)).

Defendant asserts the following comment during the prosecutor's summation

was improper:

> And I was sitting here and I hear about self-defense, suggesting that this is self-defense. In what world is what happened to [A.A.] self-defense? An honest belief he needed to protect himself when shooting her three times, was it the first shot when she was lying on the ground that he was acting in self-defense, was it the second shot when she was lying on the ground that he acted in self-defense, or was it that third shot when he fired at [A.A.] that he was acting in self-defense, hedging his bet because it's so obvious he's the shooter, hey, this honest but unreasonable belief that I could shoot her. How could you say there's an honest belief to shoot somebody on the floor? Passion/provocation, another hedging of the bet because it's so clear that he's the shooter in this case and we're going to talk about that stuff that something happened in that house that aroused his passion to lose self control and what he did by losing self control is a reasonable reaction to the circumstances.

"Prosecutors can sum up cases with force and vigor, and are afforded

considerable leeway so long as their comments are 'reasonably related to the scope

of the evidence presented.'" Id. at 593 (quoting Timmendequas, 161 N.J. 515, 587

(1999)). "A prosecutor may respond to defense claims, even if the response tends to

undermine the defense case." Nelson, 173 N.J. at 473. We are satisfied that the

manner in which the prosecutor expressed disbelief in the defense case did not exceed the bounds of propriety, particularly since the assessment was "reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999).

Defendant analogizes this case to State v. Acker, 265 N.J. Super. 351, 356 (App. Div. 1993), where we condemned a prosecutor calling a defense counsel's arguments "absolutely outrageous" and "absolutely preposterous." In Acker, 265 N.J. Super. at 354-55, the prosecutor not only disparaged the defense with unsupported allegations, but also suggested to the jury in a prosecution for sexual abuse of young girls that it was the jury's duty to protect children who had no other spokesperson, and that the alleged child victims should be given justice. Acker is clearly distinguishable from the present case, and we find defendant's analogy unpersuasive.

III.

Turning to Point II, defendant argues the court erred in denying the motion for a judgment of acquittal on attempted murder because "the State failed to prove 'the substantial step' element of attempted murder beyond a reasonable doubt." Defendant asserts that although he "expressed his displeasure that [A.A.] was going

24

to testify," nothing in the intercepted phone "conversations even remotely solicited anyone to take any sort of steps to cause her harm," and without more, his expressions are "not a cognizable attempt under the law." We agree.

A motion for judgment of acquittal at the close of the State's case may be granted "if the evidence is insufficient to warrant a conviction." R. 3:18-1.

> [T]he question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 458-59 (1967).]

We review a trial court's denial of a motion for acquittal de novo, State v. Williams, 218 N.J. 576, 593-94 (2014), using "the same standard as the [judge] in determining whether a judgment of acquittal was warranted." State v. Ellis, 424 N.J. Super. 267, 273 (App. Div. 2012). Like the trial court, we "must consider only the existence of such evidence, not its 'worth, nature, or extent.'" State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (1974)).

A defendant is guilty of attempted murder if he purposefully did anything with purpose of, and made a substantial step toward, causing the victim's death. N.J.S.A.

2C:5-1(a)(3); N.J.S.A. 2C:11-3(a)(1). "An attempt is purposeful "not only because it is so defined by statute, but because one cannot logically attempt to cause a particular result unless causing that result is one's "conscious object," the distinguishing feature of a purposeful mental state.'" State v. McCoy, 116 N.J. 293, 304 (1989) (quoting State v. McAllister, 211 N.J. Super. 355, 362 (App. Div. 1986)). The "statute requires proof of a defendant's criminal purpose, as well as evidence that he or she had taken a 'substantial step' toward the commission of an object crime." State v. Perez, 177 N.J. 540, 553 (2003) (quoting N.J.S.A. 2C:5-1(a)(3)).

"Conduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose." N.J.S.A. 2C:5-1(b). "[T]he step taken must be substantial and not just a very remote preparatory act, and must show that the accused has a firmness of criminal purpose." State v. Belliard, 415 N.J. Super. 51, 73 (App. Div. 2010) (quoting Model Jury Charge (Criminal), "Attempt" (2009)). However, "even if further major steps are required before a crime can be completed, or the accused had ample opportunity to desist prior to completing the crime, a jury can still conclude that an attempt has been committed." State v. Fornino, 223 N.J. Super. 531, 540 (App. Div. 1988).

During oral argument on defendant's motion for a judgment of acquittal on count nine, the court inquired of the State "what was the substantial step?" In

response, the State pointed to the following excerpts from the recorded phone conversations:

> [DEFENDANT]: Yeah ask him about the car and tell him what happened wit me in court like . . . he supposed to (inaudible) like what the fuck is people still walkin around for?
>
> [GIRLFRIEND]: Well, what is he . . . what am I supposed to tell him that the girl be in court?
>
> [DEFENDANT]: Yeah.
>
> . . . .
>
> [DEFENDANT]: Well you just text him off of that and tell him I said man he gotta down that shit dog
>
> [GIRLFRIEND]: (Inaudible) my phone, I'm going to text him on the Ipad (inaudible)
>
> [DEFENDANT]: This shit is just, he gotta down that, fuck that man them bitches is coming, she keep talking all this bitches ain't coming man fuck that, I don't know what the fuck they said, what they said is what happened fuck everything else it just is what is what they said is what happened, fuck it, that's just what it is man, that's just what it is
>
> . . . .
>
> [DEFENDANT]: Ain't nobody, if [n-word] was understanding my position that bitch would have been dead already if [n-word] was understanding my position, fuck outta here ain't nobody understanding my position yo that bitch is still out there running round with your sister and she's coming to court but [n-word]

is understanding my position man come on man nobody understanding my fucking position dog that shits crazy as hell yo.

. . . .

[DEFENDANT]: I wouldn't need a lawyer if [n-word] was moving and doing what they supposed to be doing the bitch should have been dead already.

[COUSIN]: I can't do it for them I can't make them get I can't make them get busy you knew who you is dealing with I can't make them get out there and get busy I can't definitely get out there and do the type of shit that they can do (inaudible)

[DEFENDANT]: Yeah I know but you can get me out of here so I can handle what I gotta handle that's my whole thing that's my whole thing I'm not worried about nobody else

. . . .

[DEFENDANT]: Hey no . . . if I was out here for one day or one week . . . it does not matter my case will be better

[COUSIN]: This is five racks you talking about (inaudible) five dollars this is [five] racks you talk about

[DEFENDANT]: It's five racks and this is my fucking life . . . but nobody but nobody's you gun go did the bitch who's gonna do something to the bitch cause she's still swinging

[COUSIN]: Oh my god

[DEFENDANT]: She's still swinging. Yo everybody knows where she's at but nothings going on, nothings going on like this shit is this shit is crazy yo oh man aright yo aright this shit is crazy . . .

. . . .

[DEFENDANT]: Shit, like this shit is crazy like motherfuckers is out there somebody should of went and downt that bitch already, like this bitch (inaudible)

. . . .

[DEFENDANT]: I am bugging and tripping cause ain't nobody getting out their fucking bed to go knock this bitch off count or say anything to the bitch, none of that nobody's going none of that everybody's just swinging still partying and bullshittin, but if it was them and they need the done shit would of got done, shit would have been done already like no if ands or buts about it.

. . . .

[DEFENDANT]: [I]f ya'll not gonna handle the situation, the [n-word] is just nervous and scared like the gun's gonna get turned on them which it might, like I have no problem with that, never did that's just me like fuck it but you know

Relying on these excerpts, the court denied defendant's motion for a judgment of acquittal on count nine. The court explained:

> Based on that, at this posture, of course, all the . . . reasonable inferences go to the State, and . . . while it is not . . . I'm giving you x to do this, or I'm telling so and so that I told him to do that, obviously, the reasonable inferences that could be drawn from some

of those calls is that the order was put out and a step was taken and that he was upset that people hadn't done it yet.

Defendant asserts that the phone conversations "merely convey[ed] [defendant's] reprehensible wish that death befell [A.A.]," but "[t]he attempted murder statute require[d] more than reprehensible wishes." Defendant asserts further that "[t]he State failed to present any evidence that defendant enlisted any specific person . . . to carry out the murder" or "promised remuneration or any other benefits to these unknown and unidentified persons in exchange for committing the offense." Thus, according to defendant, the State failed to establish that defendant "took any steps strongly corroborative of his criminal purpose." We agree.

In State v. Urcinoli, 321 N.J. Super. 519, 537 (App. Div. 1999), we determined that the defendant's conversations constituted a substantial step sufficient for an attempted murder charge where the defendant hired a fellow inmate to kill the State's witness against him. Expecting the inmate to be released soon, the defendant discussed with the inmate how the plan would be carried out and how the inmate would be paid for the murder. Ibid. The defendant also gave the inmate identifying details about the intended victim. Ibid. We found "[a] jury could reasonably conclude that by enlisting [the inmate] to his evil plan and providing information to

assist facilitating its purpose[,] . . . defendant took substantial steps to further the crime." Ibid.

Likewise, in Fornino, 223 N.J. Super. at 536-37, we determined the evidence was sufficient for the jury to conclude that the defendant had taken substantial steps to sustain an attempted murder conviction where he participated in a plan to effectuate the prison escape of his codefendant, that was thwarted when another inmate cooperated with prison officials. Because the codefendant was transported out of the prison on a regular basis for medical treatment, the plan called for the defendant to kill the guards who accompanied the codefendant on one of those trips. Id. at 533. To carry out the plan, the defendant had visited the doctors' office where the escape was supposed to occur and had surveyed a wooded area behind the office where the bodies of the murdered guards could be disposed. Id. at 538. He also arranged a meeting the night before the planned escape with the person he believed was to pay him for his part in the crime and he in fact accepted the agreed upon payment. Id. at 538-39.

Similarly, in State v. Jovanovich, 174 N.J. Super. 435 (Resent. Panel 1980), aff'd 181 N.J. Super. 97 (App. Div. 1981), we held that an individual could be found guilty of attempted arson for soliciting a specific person to burn his building, offering payment and describing to the person the layout and type of construction of the

building. We reached this conclusion even though the defendant had not yet obtained the insurance on the premises, had not paid the person for the commission of the crime, and planned to stop the plan if foreclosure proceedings on the premises stopped. Id. at 438.

Here, although defendant's wishes were reprehensible, defendant's conversations fall short of the substantial step required for attempt under N.J.S.A. 2C:5-1(a)(3). All that can be inferred from these conversations is defendant's intense disappointment that A.A. was still alive and his frustration with the circumstances that had befallen him. Without more, defendant's statements that A.A. should not be alive and that he would kill her if he were out on bail are insufficient evidence for the jury to conclude that defendant had taken a substantial step. Without evidence of an act by defendant identifying a perpetrator and orchestrating the requisite course of conduct to culminate in the commission of the crime, the State's proofs fall short.

Accordingly, we conclude the attempted murder conviction in count nine must be reversed. Therefore, we vacate the conviction on count nine and remand for resentencing. Because we remand for resentencing, we need not address defendant's challenge to his sentence.

Affirmed in part; reversed in part; and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0215-15T2